OPINION
{¶ 1} Plaintiff-Appellant, Susan R. Gibson, individually and as administratrix of the Estate of Mike E. Gibson, and also as parent, natural guardian and next friend of Kayla and Samantha Gibson (collectively, "plaintiff"), has appealed the judgment of the Paulding County Common Pleas Court directing a verdict in favor of Defendant-Appellee, Drainage Products, Inc ("defendant"), on the grounds that plaintiff failed to prove the second prong of the three-prong test for intentional workplace tort claims announced by the Ohio Supreme Court in Fyffe v. Jeno's, Inc.[1] On March 2, 2001, this Court affirmed the entry of directed verdict on the grounds that defendant had failed to satisfy the third prong of the test.[2] Upon further review, the Ohio Supreme Court found, contrary to our prior decision, that plaintiff had satisfied the third prong of the test and remanded the matter to this Court for consideration of plaintiff's remaining assignments of error, including whether sufficient evidence was presented to survive directed verdict with regard to the first two prongs of the Fyffe test.[3]
 {¶ 2} Reviewing the first two prongs of the Fyffe test, we find that there is sufficient evidence upon which a rational trier of fact could conclude that the defendant knew that the manufacturing line was dangerous and that harm was substantially certain to occur if defendant failed to comply with the "lockout — tagout" procedure when conducting repairs of the manufacturing line. In the remaining assignments of error, plaintiff contends that the trial court erred in permitting testimony regarding Susan Gibson's cohabitation with another man after her husband's death and in allowing the defendant to question her expert concerning the application of OSHA standards. We find that plaintiff waived any error regarding the cohabitation evidence by eliciting the evidence upon direct examination of Susan Gibson. Furthermore, given the material discussed in plaintiff's examination of its expert witness, we find that defense counsel was entitled to cross-examine the witness and impeach him as to his knowledge and application of OSHA regulations. Accordingly, consistent with the Ohio Supreme Court's pronouncement and our determinations herein, we must reverse the judgment of the trial court.
 {¶ 3} This case arose from a February 21, 1996 incident, which led to the death of Mike Gibson during the course of his employment with defendant. The defendant is a company that manufactures plastic corrugated drainage pipe and employed Mike Gibson on a full-time basis from March 1994 until his death. As part of defendant's manufacturing process, plastic chips are fed by a conveyor into an "extruder" that heats the plastic until it becomes malleable, at approximately 500 degrees Fahrenheit. The plastic is then pushed through a "screen changer" that removes impurities and then through two pipes that force the molten plastic into a die that molds it into a tube shape. At certain intervals the piping is wrapped with heating coils, which are intended to keep the plastic at a consistent temperature as it passes through the machine. The manufacturing line is approximately sixty feet long.
 {¶ 4} On February 21, 1996, defendant's employee, Tim Jewell, who was working as an "operator" of a portion of the manufacturing line, noticed that molten plastic appeared to be seeping from around the screen changer. Various employees conferred about the issue and began efforts to repair the problem.
 {¶ 5} Mike Gibson was a "mixer" and did not work directly on the line; he worked in a different but nearby area of the plant. However, testimony in the record indicated that employees who had completed their assigned tasks were expected to assist other employees. Gibson approached the scene to offer assistance. Shortly thereafter, the die emitted a hissing sound, a "pop," and then molten plastic blew out of the pipe connected to the die. Gibson was standing approximately three feet away from the open end of the pipe and was sprayed directly in the face with molten plastic. He was immediately transported by EMS to the Van Wert County Hospital and subsequently to Parkview Memorial Hospital in Fort Wayne, Indiana. While at the Indiana hospital, Gibson suffered an asthma attack that was allegedly treated in a negligent manner and died three days after the initial injury.
 {¶ 6} On January 21, 1997, plaintiff filed this action in the Paulding County Common Pleas Court, alleging that Haviland Drainage Products, Inc. had committed an intentional tort against Mike Gibson that resulted in his death. Plaintiff also alleged medical malpractice against the Indiana Hospital and the two Indiana doctors who had treated Mr. Gibson. The claims against the Indiana defendants were dismissed prior to trial due to lack of personal jurisdiction. Moreover, while defendants, Drainage Products, Inc. and Haviland Products, Inc. are separate but related companies, Mike Gibson was employed by Drainage Products, Inc. As a result, plaintiff filed an amended complaint proceeding solely against defendant Drainage Products, Inc.
 {¶ 7} The matter proceeded to trial solely on the intentional tort claim against defendant. Defendant moved for summary judgment contending, in part, that plaintiff had failed to present evidence sufficient to establish intent according to the "substantial certainty" test set forth in Fyffe.[4] By entry dated April 27, 1998, the trial court overruled the motion.
 {¶ 8} The matter proceeded to a jury trial on October 25, 1999. At the close of plaintiff's case, defendant moved for a directed verdict pursuant to Civ.R. 50(A), again contending that plaintiff had not proven the necessary elements for establishing an intentional tort as set forth in Fyffe. The trial court agreed as to the second prong (i.e., that the employer had knowledge that if the employee were subjected to the dangerous procedure, process, instrumentality or condition, then harm will be a substantial certainty) and granted the motion, entering a directed verdict in defendant's favor. Plaintiff appealed this determination, asserting three assignments of error for our review.
 {¶ 9} As mentioned previously, we affirmed the entry of directed verdict on different grounds, determining that plaintiff had failed to present sufficient evidence of the third prong (i.e., that defendant had required Gibson to continue to perform any dangerous task).[5] Given our disposition of the first assignment of error, we found the remaining evidentiary arguments to have been rendered moot.[6] Upon further review, the Ohio Supreme Court found that reasonable minds could differ as to whether defendant had required plaintiff to engage in a dangerous task.[7] Pursuant thereto, the Supreme Court remanded the matter to this Court for consideration of the plaintiff's remaining assignments of error, including whether sufficient evidence was presented to survive directed verdict with regard to the first two prongs of the Fyffe test.
 Assignment of Error I {¶ 10} "The trial court erred in directing a verdict for defendant at the close of plaintiff's case as plaintiffs did prove a prima facie case of an employer intentional tort."
 {¶ 11} In Fyffe the Ohio Supreme Court modified and explained the three-prong test that an employee must satisfy in order to prevail on a workplace intentional tort claim against an employer: "[I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."[8]
 {¶ 12} Plaintiff's safety expert, James McCarthy, visited the defendant's plant, examined the manufacturing line, and reviewed defendant's OSHA file and employee depositions. McCarthy described the "hot plastic material that exploded out of the system and sprayed and * * * ultimately killed Mr. Gibson" as a "hazard." He indicated that in safety analysis terms a "risk" is the probability of exposure to a hazard, and noted that "the methodology to analyze the risk is essentially how do you minimize the hazard coming into play, the method for that, to accomplish that. In other words, to keep the plastic from exploding out because it's going to burst through a plug that happens to be in there in a cooled section with hot plastic behind it. * * * * That is done by de-energizing the system, all power systems to it and locking out and tagging out the system."
 {¶ 13} McCarthy opined that Mike Gibson's injury and subsequent death "was a result of lack of de-energization and lockout of an extruder system there at the plant." He analogized the mechanism to "putting a snowball in a pipe and running hot water behind it," repeatedly characterizing the likelihood of danger in defendant's plant from the failure to de-energize and lockout the extruder line as "100 percent." "Eventually, you're going to move that snowball, you're going to dissipate that snowball, and you're going to have in that analogy hot water shooting out." He observed that it was a mere matter of time before an employee was injured by the employer's failure to utilize those procedures, opining that there was a "100 percent" certainty that molten plastic would spray from an open end of the line as soon as the cold plastic plugging the line became hot enough, and that this known risk posed a substantial certainty of serious harm to all of defendant's employees. McCarthy testified that the defendant's failure to de-energize and failure to comply with lockout-tagout procedures was not in compliance with OSHA regulations, did not meet the standard of practice in the machinery industry, was not in compliance with defendant's own written policy, and that defendant was aware of the hazard posed by the plastic and the proper procedures necessary to neutralize that hazard. He concluded that if defendant had complied with lockout-tagout and de-energization procedure, Mike Gibson would not have been injured.
 {¶ 14} Mike Gibson's foreman, John Meggitt, admitted that he knew at the time of the accident that when a solidified plastic plug formed "the molten plastic that's up against the inner edge of the plug is going to melt the plug," and that anyone who had worked around the plastic manufacturing machine for "awhile" would have known that turning off only some of the heaters would form a hot spot that would eventually spray plastic. He also stated that he felt that prior to the accident he had not been properly trained, and that proper training would have included instruction on de-energizing the entire manufacturing line when conducting repairs. Finally, he acknowledged that the company had changed its procedures since plaintiff's decedent was injured, and it was now the practice to shut down the entire line and shut off all heaters when conducting repairs.
 {¶ 15} Similarly, Robert Hughes, who was in charge of safety at the defendant's plant, admitted that it was a "virtual certainty" that given a long enough period of time molten plastic would break through the plug and a person standing in the front of the plugged pipe would be injured. Hughes specifically testified that he was aware that a "lockout-tagout" plan and procedures were necessary for the safety of plant employees and was told that a violation of the plan could result in an injury or death.
 {¶ 16} Considering John Meggitt's testimony that anyone who had worked around the machinery would have known that a plastic plug could melt under such circumstances and his testimony that he had not been properly trained, as well as the evidence from plaintiff's expert as to the existence of the hazard of spraying plastic at defendant's plant and the expert's testimony that both the OSHA regulations and defendant's own policy implementing them required the entire line to be shut down, we conclude that there is sufficient evidence upon which a rational trier of fact could conclude that the defendant knew that the manufacturing line was dangerous and that harm was substantially certain to occur if defendant failed to comply with the "lockout — tagout" procedure when conducting repairs of the manufacturing line.
 {¶ 17} In granting the directed verdict, the trial court appears to have misapplied the second prong of the Fyffe test. Whether or not an event is "substantially certain" to occur can often only be shown by circumstantial evidence.[9] While the trial court correctly observed that "there has to be some notice to [the second prong of the Fyffe
test]," that notice need not take the form of a previous workplace incident. The substantial certainty test does not establish a "one free bite" rule, and accordingly it was not necessary for plaintiff to show that plastic had blown out of the extruder in the same location on a previous occasion. Rather, we find that plaintiff established a question for the jury on these facts by showing that the defendants knew of the risk of the extruder spraying molten plastic, knew why plastic might spray out of the extruder, knew that there were safety procedures associated with the operation of the extruder to prevent the spraying of plastic, and knew that the failure to utilize the safety procedures carried a serious risk of danger that could result in injury or death to their employees but still disregarded those safety procedures. For these reasons, the trial court's decision to grant a directed verdict based upon the second prong of the Fyffe test was improper.
 Assignment of Error II {¶ 18} "The trial court erred in ruling it was admitting evidence of the surviving spouse cohabitating with another after decedent's death."
 {¶ 19} At trial, plaintiff moved the trial court to prevent the defendant from admitting evidence that Susan Gibson, Mike Gibson's widow, had been cohabitating with another man after his death immediately prior to calling her as a witness. Plaintiff's counsel informed the court that if the evidence was deemed admissible, he would bring out the issue on direct examination instead of objecting to the evidence upon submission by defendant. The court found that evidence of her cohabitation with another male was relevant to the issue of damages and her loss of consortium claim. Plaintiff's counsel proceeded to call Susan Gibson to the witness stand and inquire about her cohabitation with another man after her husband's death.
 {¶ 20} At the outset, we observe that, while made at trial, plaintiff's motion is essentially a motion in limine. A pretrial ruling on a motion in limine is a "tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context. An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial."[10] However, a subsequent ruling contemporaneous to the submission of the evidence at trial on the record when the issue is actually reached and developed which conforms or conflicts with the tentative order in limine may be sufficient to preserve an alleged error for review on appeal.[11] "[I]n order to preserve supposed error from an anticipatory order in limine, the complaining party must raise the evidentiary issue on the record at the place in the trial that the foundation and context have actually been developed. * * * If counsel opposes the reception of an adverse party's evidence, he must object when the evidence is actually presented, or he may well have waived any objection to the denial of his earlier motion in limine."[12]
 {¶ 21} A party cannot, however, in one instance complain of the introduction of an issue and then introduce that issue on direct examination without waiving his prior objection. While the strategy of lessening the negative impact of the evidence by revealing the evidence and explaining it upon direct is recognized and accepted by many trial attorneys as a proper course of action, by making the choice to introduce the evidence directly, a party waives the issue for appeal.[13] By voluntarily introducing testimony concerning Susan Gibson's cohabitation with another man after Mike Gibson's death on direct examination, plaintiff waived any objection to introduction of evidence related thereto.[14]
{¶ 22} Accordingly, plaintiff's second assignment of error is overruled.
 Assignment of Error III {¶ 23} In the third assignment of error, plaintiff avers that "[t]he trial court erred in permitting defense counsel to adduce and argue that since OSHA cited the violations as serious, not willful, no employer intentional tort claim existed." Plaintiff maintains that the intermingling of OSHA standards with that of intentional workplace tort law could only serve to confuse and mislead the jury, thereby mandating exclusion of the assertedly prejudicial evidence under Evid.R. 403(A).
 {¶ 24} At the outset, we note that the admission or exclusion of evidence rests within the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion that materially prejudices a party.[15] An abuse of discretion implies that a court's actions are unreasonable, arbitrary or unconscionable.[16] A decision is unreasonable if no sound reasoning process would support the decision.[17] Evid.R. 403(A) provides that, even if relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 25} As discussed above, plaintiff called as an expert witness James McCarthy, a safety specialist specializing in the identification, evaluation, and minimization of industrial safety hazards. McCarthy was retained by plaintiff to investigate the circumstances of the underlying incident and render an opinion to a reasonable degree of professional certainty as to the nature of the danger associated with conditions surrounding the incident and causation of the accident. For his opinion, McCarthy reviewed applicable OSHA regulations and was questioned by plaintiff's counsel as to the role of those regulations in the accident. In addition, he was given several hypotheticals concerning the conduct of the participants in the event and was asked his opinion as to whether their conduct satisfied OSHA standards or regulations. McCarthy was further asked to review the circumstances in light of the elements necessary to establish an intentional tort.
 {¶ 26} Given the preceding discussion of McCarthy's expertise, the role and application of OSHA regulations in the underlying incident, and the satisfaction of elements necessary to establish an intentional tort, defense counsel was entitled to cross-examine McCarthy and impeach him as to his knowledge of OSHA regulations, the nature of and varying degrees of OSHA violations, and application of those standards to the circumstances of the underlying incident, and to compare those standards to the elements necessary for an intentional tort claim. Any perceived discrepancy or confusion as to the application of those regulations or the elements necessary for the intentional tort claim could have been addressed by plaintiff's counsel upon redirect or by appropriate jury instructions. Therefore, we do not find that the trial court abused its discretion in this regard. Accordingly, plaintiff's third assignment of error is overruled.
 {¶ 27} Because appellant's first assignment of error has been determined to have merit, the judgment of the Paulding County Common Pleas Court is hereby reversed and this cause is remanded for further proceedings in accordance with this opinion.
Judgment reversed and cause remanded.
 SHAW, P.J., and HADLEY, J., concur.
[1] Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115.
[2] Gibson v. Drainage Products, Inc. (March 2, 2001), Paulding App. No. 11-99-14.
[3] Gibson v. Drainage Products, Inc. (2002), 95 Ohio St.3d 171,2002-Ohio-2008.
[4] Fyffe, 59 Ohio St.3d 115 at paragraphs one and two of the syllabus.
[5] Gibson v. Drainage Products, Inc. (March 2, 2001), Paulding App. No. 11-99-14.
[6] Id.
[7] Gibson v. Drainage Products, Inc. (2002), 95 Ohio St.3d 171,2002-Ohio-2008.
[8] Fyffe, 59 Ohio St.3d 115 at paragraph one of the syllabus.
[9] Cf. Hanna v. Dayton Power Light Co. (1998), 82 Ohio St.3d 482,485, citing Adams v. Aluchem, Inc. (1992), 78 Ohio App.3d 261, 264;Fyffe, 59 Ohio St.3d 115 at paragraph two of the syllabus.
[10] State v. Grubb (1986), 28 Ohio St.3d 199, 201.
[11] State v. Maurer (1984), 15 Ohio St.3d 239, 259, fn. 14, citing Palmer, Ohio Rules of Evidence, Rules Manual (1984) at 446; Schurr v.Davies (May 15, 1986), Van Wert App. No. 15-84-23, quoting State v.White (1982), 6 Ohio App.3d 1, 5; see, also Thomas v. Tuway AmericanGroup (Jan. 25, 2000), Mercer App. No. 10-99-17; State v. Boyd (Jan. 12, 1995), Cuyahoga App. No. 65883.
[12] White, 6 Ohio App.3d at 4 (citation omitted).
[13] Klien v. Dietz, M.D. (Dec. 16, 1998), Mahoning App. No. 95 CA 47, citing State v. Miller (1988), 56 Ohio App.3d 130, 132; State v.McCaskill (Oct. 3, 1996), Franklin App. No. 96APA03-287.
[14] Id.; State v. Leslie (1984), 14 Ohio App.3d 343, 344; State v.Bolton (May 30, 2000), Columbiana App. No. 98-CO-33, dismissed, appeal not allowed by 90 Ohio St.3d 1427; Rodock v. Village of Minerva Park
(Dec. 19, 2000), Franklin App. No. 99AP-1402; State v. Wilson (1982),8 Ohio App.3d 216.
[15] Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66.
[16] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[17] AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161.