[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 171.]

GIBSON, ADMR., APPELLANT, *v*. DRAINAGE PRODUCTS, INC., APPELLEE.

[Cite as *Gibson v. Drainage Products, Inc.*, 2002-Ohio-2008.]

*Employer and employee—Requirements employee must satisfy in order to prevail against employer for an intentional tort—Fyffe v. Jeno's, Inc., applied—Determining whether sufficient evidence exists to survive employer's motion for a directed verdict.*

(No. 2001-0588—Submitted February 6, 2002—Decided May 8, 2002.)

APPEAL from the Court of Appeals for Paulding County, No. 11-99-14, 2001-Ohio-2110.

_____

DOUGLAS, J.

{¶1} On February 21, 1996, Mike Gibson was an employee of appellee, Drainage Products, Inc. On that day, Gibson suffered severe burns as a result of a manufacturing accident that occurred at one of appellee's plants. Gibson died three days later as a result of his injuries and complications.

{¶2} Appellee is a manufacturer of corrugated plastic drainage tubing. As part of appellee's manufacturing process, raw plastic is placed into a machine called an extruder, which heats the plastic, melting it into a malleable form. Electric heaters located on the outside of the extruders are used to heat the plastic to approximately five hundred degrees Fahrenheit in order to keep it malleable and permit it to flow through the manufacturing line. Once the plastic is heated in the extruder, it travels through a "screen changer" that removes dirt and debris from the plastic. The plastic then passes into a die, where it is molded into a circular pipe shape.

{¶3} On the day in question, Timothy Jewell was working as an operator on one of the extruder lines when he noticed that "hot molten" plastic appeared to be

leaking from the screen changer. In an effort to stop the leakage, Jewell attempted to tighten bolts near the screen changer and in the process broke some of the bolts. At that point, Jewell notified his foreman, John Meggitt, who instructed Jewell to shut down the line so that the bolts could be replaced.

{¶4} Either Jewell or Meggitt then proceeded to repair the broken bolts that held the pipes and screen changer together.[1] At some point Jewell remained at the work site and began to remove plastic residue that had accumulated around the screen changer, while Meggitt left the work area to find replacement bolts.

{¶5} Prior to cleaning the plastic residue, Jewell separated the manufacturing line at the screen changer. The extruder was shut down and the electrical heaters in the area of the repair were turned off.[2] Apparently, however, the electric heaters surrounding the pipe leading into the die cast were left on. These heaters were located approximately four to five feet from the electric heaters in the area of the screen changer that had been deactivated.

{¶6} Gibson was working as a "mixer" on the day of his accident in an area of appellee's plant approximately thirty-five to forty feet from where Jewell was stationed. Gibson approached Jewell and asked whether Jewell needed any help. Appellee's employees indicated that it was company policy for workers to offer such assistance once assigned duties were completed. In fact, appellee's safety director testified that employees were expected to check with a supervisor for another assignment once assigned tasks were completed. Meggitt, who had left the area of repair to obtain new bolts, was Gibson's supervisor.

{¶7} Jewell declined Gibson's offer of assistance. At about the same time, appellee's maintenance supervisor, Randy Bullinger, came upon the area of repair.

---

1. The testimony on this point is conflicting, as Jewell and Meggitt each testified that he had removed the bolts.
2. Once again the testimony of Jewell and Meggitt is at odds. While there is no dispute that the extruder was shut down and the heaters were turned off in the vicinity of the repair, Jewell and Meggitt disagree as to who actually performed this procedure.

After a brief discussion with Jewell, Bullinger heard a hissing sound and immediately yelled "watch out." Jewell, who testified that he heard a bang or "popping" sound prior to the explosion, was able to drop to the floor. However, Gibson, who was standing approximately three feet away from the open pipe, was sprayed directly in the face, neck, and chest with hot molten plastic.

{¶8} Gibson was transported by ambulance to Van Wert Hospital and, thereafter, transferred to Parkview Hospital in Fort Wayne, Indiana. While at Parkview, Gibson was treated for first, second, and third degree burns. Gibson also underwent a surgical procedure to remove the molten plastic material that had adhered to his skin, primarily to his face. Gibson died three days after he was admitted to Parkview.

{¶9} The Occupational Safety and Health Administration ("OSHA") cited appellee for numerous violations related to Gibson's accident, including appellee's failure to comply with its own written lockout/tagout safety program. The lockout/tagout safety procedure is required during "the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or [the] release of stored energy could cause injury to employees." (Emphasis sic.) Section 1910.147(a)(1)(i), Title 29, C.F.R. OSHA rules mandate that employers establish energy control lockout/tagout procedures, including employee training and periodic inspections, to ensure that before any employee performs any servicing or maintenance on a machine or equipment that is subject to unexpectedly energizing, starting up, or releasing stored energy, "the machine or equipment shall be isolated from the energy source, and rendered inoperative." Section 1910.147(c)(1), Title 29, C.F.R. Appellee had previously been cited by OSHA in 1994 for not having a written lockout/tagout program.

{¶10} On January 21, 1997, Gibson's widow, appellant Susan R. Gibson, individually and as administrator of the estate of Mike Gibson, and also as parent and natural guardian of Kayla and Samantha Gibson, filed a complaint against

appellee and others in the Court of Common Pleas of Paulding County.[3] Appellant's complaint alleged that appellee had committed an intentional tort against Mike Gibson that resulted in his death. Appellant also alleged claims of medical malpractice against Parkview Memorial Hospital and two Indiana physicians who had treated Mike Gibson. Appellant's malpractice claims were dismissed prior to trial due to a lack of personal jurisdiction over the Indiana defendants.

{¶11} The matter proceeded to trial solely on the intentional tort claim against appellee. Appellee moved for summary judgment contending, in part, that appellant had failed to present evidence sufficient to establish intent according to the "substantial certainty" test set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraphs one and two of the syllabus. By entry dated April 27, 1998, the trial court overruled appellee's motion for summary judgment.

{¶12} The matter proceeded to a jury trial on October 25, 1999. At the close of appellant's case, appellee moved for a directed verdict pursuant to Civ.R. 50(A), again contending that appellant had not proven the necessary elements for establishing an intentional tort as set forth in *Fyffe*. The trial court agreed and granted appellee's motion for directed verdict. The trial court found that appellant had failed to establish, as required by the second element of the *Fyffe* test, that prior to the accident appellee knew of the existence of a dangerous process, procedure, equipment, or condition within its facility that was substantially certain to cause harm to Mike Gibson or any other employee.

{¶13} Appellant appealed the trial court's ruling to the Paulding County Court of Appeals. The court of appeals, in a split decision, affirmed the trial court's judgment on different grounds. The court of appeals focused its attention on the

---

3. Haviland Drainage Products, Inc., was originally named as a party defendant. Haviland and appellee, Drainage Products, Inc., are separate but related companies. Mike Gibson worked for Drainage Products, Inc., and an amended complaint was filed correcting this error.

third element of the *Fyffe* test, which requires the employee to demonstrate "that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id.*,* 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph one of the syllabus. The court of appeals determined, based on the evidence submitted, that appellant had failed to raise even the inference that appellee had required Mike Gibson to continue to perform any dangerous task. The court of appeals found appellant's remaining evidentiary issues moot. Judge Shaw dissented, finding that appellant presented sufficient evidence at trial to survive a motion for directed verdict in regard to all three elements of the test set forth in *Fyffe.*

{¶14} This matter is now before this court upon the allowance of a discretionary appeal.

{¶15} Appellant contends that the court of appeals erred in affirming the directed verdict in appellee's favor. Appellant urges this court to find that an injured employee can satisfy the third element of the *Fyffe* test if evidence is submitted showing that the employer required the employee to be in the work environment or vicinity where a dangerous process, procedure, condition, or instrumentality is substantially certain to cause injury.

{¶16} The law setting forth the necessary elements and level of proof required in order to demonstrate a workplace intentional tort is well established. In *Fyffe,* 59 Ohio St.3d 115, 570 N.E.2d 1108, we modified and explained the three-prong test originally set forth in *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, that an employee must satisfy in order to prevail on a workplace intentional tort claim against an employer. We held in *Fyffe* that "in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within

its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Id.,* 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus.

{¶17} In paragraph two of the syllabus in *Fyffe,* we further outlined the proof necessary to establish intent on the part of the employer when we stated that "[t]o establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent."

{¶18} As previously noted, for reasons different from those relied upon by the trial judge, a majority of the court of appeals found no error in the trial court's decision to grant appellee's motion for directed verdict. The court of appeals determined that appellant had failed to establish the third element of the test set forth in *Fyffe,* and instead concluded that Mike Gibson had placed himself in danger by choice and not as a requirement of employment. The court of appeals concluded that there was no evidence from which the jury could have inferred that appellee had required Mike Gibson to be in the area to offer assistance with the problem. The court of appeals further found that there was no evidence submitted that Gibson

was in the area in search of his immediate supervisor to obtain another assignment. We disagree.

{¶19} Civ.R. 50(A)(4) provides:

{¶20} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶21} "By the same token, if there is substantial competent evidence to support the party against whom the motion [for directed verdict] is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320 [27 O.O.2d 241], 199 N.E.2d 562." *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 363 N.E.2d 367. As we stated in *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, "[i]t is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue, or, conversely, to withhold an essential issue from the jury when there *is not* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue." (Emphasis sic.) Id., paragraph four of the syllabus. Moreover, the party against whom the motion is directed is entitled to have the trial court construe the evidence in support of its claim as truthful, giving it its most favorable interpretation, as well as having the benefit of all reasonable inferences drawn from that evidence. *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935.

{¶22} Appellant introduced deposition and trial court testimony indicating that it was company policy for employees, once their own assigned duties were

completed, to seek out additional work assignments and to assist fellow employees in fulfilling other employment responsibilities. Timothy Jewell, a former mixer and the operator of the extruder line that caused Gibson's injuries, testified that if employees completed their work, the company expected them to perform other duties and to help fellow employees complete job tasks. Furthermore, Robert Hughes, appellee's safety director, testified by deposition that on the date of the accident, Mike Gibson did nothing wrong to cause his injuries.[4] In addition, during his deposition Hughes indicated that it would not be unusual for Gibson to complete his duties as a mixer and that, in those instances, he would be expected to find other work. During his examination at trial, Hughes reiterated that Mike Gibson was expected to seek other work once he completed his mixing duties and, more important, Hughes testified that employees who had completed assigned tasks were required to ask their supervisors for additional assignments.

{¶23} In *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 696 N.E.2d 1044, we considered a situation analogous to the instant matter. The employee in *Hannah* was a volunteer member of the employer's emergency rescue squad who died while attempting to rescue fellow employees stranded several hundred feet in the air on the platform of a nine-hundred-foot smokestack. We held in *Hannah* that, according to the third element of the *Fyffe* test, the employer did not have to expressly order the employee to engage in the dangerous task that led to his death. Id. at 487, 696 N.E.2d 1044. Instead, we concluded that, in an action alleging a workplace intentional tort, in order to overcome a motion for summary

_____

4. We are aware that Hughes's trial testimony on this issue conflicts with his deposition testimony and that appellant's trial counsel attempted to impeach the witness regarding this discrepancy. However, in ruling on the propriety of a directed verdict, we are not permitted to weigh the evidence. *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus ("A motion for directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence"). In determining whether sufficient evidence exists to survive a motion for directed verdict, our task is merely to construe the evidence, as well as all reasonable inferences, in favor of the nonmoving party.

judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in the dangerous task. Id. In *Hannah,* there was evidence that the rescue squad was composed entirely of volunteers and that decedent had volunteered to perform the rescue. Nevertheless, based upon testimony that the employer expected the rescue squad to respond to the emergency and to do so in a safe manner, as well as other evidence, we concluded that reasonable minds could differ as to whether the employer required the employee to engage in the dangerous task. Id.

{¶24} While the issue in *Hannah* concerned the evidence necessary to survive summary judgment in relation to the third element of *Fyffe*, the rationale applied in *Hannah* is equally applicable to situations involving Civ.R. 50 motions for directed verdict. See *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, citing *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511. Thus, for purposes of surviving a motion for directed verdict, it is not necessary for an employee to show that the employer expressly ordered the employee to engage in the dangerous task. Instead, the third element of the *Fyffe* test can be satisfied by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in that dangerous task. *Hannah,* 82 Ohio St.3d at 487, 696 N.E.2d 1044. Moreover, *Hannah* was quite explicit in its determination that a jury issue arises concerning the third element of the *Fyffe* test when sufficient credible evidence is presented that the employer merely expected the employee to engage in a dangerous task. Id. In light of the foregoing, and after consideration of the evidence submitted herein, we conclude that appellant presented sufficient evidence to withstand appellee's motion for directed verdict.

{¶25} Construing the evidence and all reasonable inferences in favor of appellant, we find that reasonable minds could differ in this matter as to whether

the employer required the employee to engage in a dangerous task. Clearly, a jury could reasonably conclude that Mike Gibson was in the area of repair offering assistance to Tim Jewell as he was expected to according to the terms and conditions of employment or, alternatively, that Gibson had been in the area attempting to locate his supervisor to obtain another assignment. As Judge Shaw correctly noted in his dissent, either determination by a jury would satisfy the appellant's burden on the third element of *Fyffe*.

{¶26} In so holding we necessarily reject the court of appeals' assertion that the appellee's general expectation that its employees will inquire about and perform work outside their primary duties "is not tantamount to a *requirement* that Mike Gibson specifically assist in the repair of a manufacturing line without the power to the entire line having been first shut down." (Emphasis sic.) There is nothing in the language of the third element or in our prior case law that would lead to the conclusion that appellee must specifically require Gibson to engage in repair of the manufacturing line. The test set forth in *Fyffe* requires only that the employer possess knowledge of a dangerous condition within its business and knowledge that, if the employer exposes an employee to such dangerous condition, then harm to the employee is substantially certain to occur. *Fyffe*, 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus.

{¶27} In any event, the standard for establishing an intentional tort "emerges not so much from the words used to formulate the test as it does from the decisions rendered in response to specific fact situations. Such is the nature of the common law." *Kunkler v. Goodyear Tire & Rubber Co.* (1988), 36 Ohio St.3d 135, 139, 522 N.E.2d 477. With that in mind, cases involving workplace intentional torts must be judged on the totality of the circumstances surrounding each incident. Here, molten plastic was forcefully discharged from appellee's manufacturing line and traveled a distance of approximately three to four feet before it struck and severely burned Mike Gibson. Whether Gibson was specifically requested to

participate or was actually participating in the ongoing repair of the extruder is not relevant to determining whether Mike Gibson was required to perform a dangerous task. Rather, the primary concern is whether appellee, through its policies and conditions of employment, placed Gibson in a position where he was subjected to a "dangerous process, procedure, instrumentality or condition" and harm was substantially certain to follow.

{¶28} Finally, we address appellee's apparent confusion regarding the degree of knowledge required for the third element of the *Fyffe* test. Appellee contends that there is no evidence in this case that appellee knowingly required appellant's decedent to engage in a dangerous task. Not only is this argument completely contrary to our holding in *Hannah,* it is also contrary to the very foundation relied upon by this court in establishing workplace intentional tort jurisprudence in this state. " 'All consequences which the actor desires to bring about are intended, as the word is used in [the] Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.' " *Van Fossen v. Babcock & Wilcox Co.,* 36 Ohio St.3d at 115, 522 N.E.2d 489, quoting 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A, Comment *b.* In other words, appellee could be liable for the consequences of its acts even though it never intended a specific result.

{¶29} Accordingly, we hold that, in regard to the third element of the test set forth in *Fyffe,* appellant has submitted sufficient, credible evidence to overcome appellee's motion for directed verdict. A final determination regarding the third element of *Fyffe* must, nevertheless, be left to a jury. However, because the appellate court found appellant's remaining issues on appeal moot, this matter must first be remanded to the court of appeals in order to address appellant's remaining assignments of error, including whether appellant has presented sufficient evidence

to survive a motion for directed verdict in relation to the first two elements of the *Fyffe* test.

**{¶30}** Accordingly, the judgment of the court of appeals is reversed, and this cause is remanded to the court of appeals for further proceedings consistent with this decision.

Judgment reversed

and cause remanded.

MOYER, C.J., RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**COOK, J., dissenting.**

**{¶31}** I cannot join the majority's departure from the test this court set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108. *Fyffe* refined this court's determination that an Ohio employee could recover damages from his or her employer where the employer could be said to have *intended* to injure the employee. Today's majority essentially obviates the third prong of *Fyffe*. It does so by concluding that reasonable minds could find the required performance of a dangerous task in an employer's general mandate that an employee seek other work.

**{¶32}** Here, the plaintiff produced no evidence in her case-in-chief that the employer assigned Gibson to perform a particular task. Without evidence of that, there could be no proof that the employer knew that Gibson was substantially certain to be harmed in "perform[ing] *the dangerous task*," as the third prong of *Fyffe* prescribes. Thus, the trial court properly directed the verdict at the close of the plaintiff's case. I would, accordingly, affirm the judgment of the court of appeals upholding the directed verdict.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

_____

Murray & Murray Co., L.P.A., W. Patrick Murray, William H. Bartle and Steven C. Bechtel, for appellant.

Cook, Troth & Burkard, Ltd., Glenn H. Troth and Norman E. Cook, for appellee.

_____