[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} This is an appeal by plaintiff, Vicki Fields, from a judgment of the Ohio Court of Claims finding in favor of defendant, Ohio Department of Rehabilitation and Correction, on plaintiff's intentional tort claim.
 {¶ 2} Plaintiff is a corrections officer ("CO") at the Southern Ohio Correctional Facility ("SOCF"). In February 1997, an inmate assaulted plaintiff at the facility during plaintiff's regular work shift. The testimony at trial indicated the following factual background regarding the assault.
 {¶ 3} On February 6, 1997, plaintiff was working second shift as a relief officer in cellblock "L-1." The cellblock has an upper and lower level of cells, capable of housing 80 general population inmates, and it also contains a control booth from which a CO electronically controls the operation of cell doors and gates.
 {¶ 4} Two officers work together in a cellblock during a shift, and CO James Neal was working second shift with plaintiff in cellblock L-1 on the date of the incident. Plaintiff worked part of her shift in the control booth, but later went out into the "range" area. During rounds, plaintiff observed a towel on the cell door of one of the inmates. Plaintiff told the inmate, James Harris, to remove the towel, but he refused. Plaintiff then walked toward the cell to retrieve the towel, but Harris grabbed the towel through the other side of the cell bars.
 {¶ 5} Plaintiff informed Lieutenant Charles Rogers of the incident, and Rogers ordered Harris to give plaintiff the towel. At 8:30 p.m., plaintiff wrote a conduct report regarding the incident. CO Neal subsequently opened Harris's cell door so Harris could take a shower. A few minutes before 9:00 p.m., CO Neal opened the shower door to allow Harris to return to his cell. CO Neal then went to the control booth, while plaintiff began an inmate count. Harris initially started walking in the direction of his cell, but then turned and came down a flight of stairs toward the control booth. CO Neal gave Harris a direct order to go to his cell, but Harris instead came to the control booth area and requested some "kites," papers used by inmates for intra-institutional mail. CO Neal gave Harris some kites through a hatch and again ordered him to return to his cell for the inmate count. Harris started up the flight of stairs but then turned around, approached the bottom of the range, and started walking toward plaintiff. CO Neal started "beating on the glass of the control booth, trying to get her attention, to let her know he was walking toward her." (Tr. 46.)
 {¶ 6} CO Neal observed Harris approach plaintiff and hit her in the face with a closed fist, causing her to fall to the ground. CO Neal placed a call to Control Center 1, the main control center, and Lieutenant Larry Turner answered. CO Neal reported that an officer was down and that assistance was needed in cellblock L-1. During this time, plaintiff struggled to crawl away from her assailant, but Harris grabbed plaintiff by her hair and dragged her to the middle of the range; he started striking her with a closed fist and kicking her. CO Neal heard Lieutenant Turner report over the radio to "notify Control 1 to all units, we have an officer down on L-1." (Tr. 51.)
 {¶ 7} CO Neal immediately opened two wing gates "on the side to get into the sallyport." (Id.) Although Neal opened these two gates, he had to wait for the officer in Control Center 5 ("CC-5") to engage the "override" system so all of the gates would open. The gates, however, did not immediately open. The evidence indicated that, at approximately 9:00 p.m., CO Connie Ward had temporarily relieved CO Sheila Albrecht in CC-5 in order for Albrecht to take a restroom break. CO Ward was in the booth when radio information was relayed that an officer was down, and she hit the "override" button to open the gates but failed to hold the button down long enough so the gates could open. Eventually, another CO entered the CC-5 control booth and held down the override button, allowing the gates to open for COs to come to the aid of plaintiff. In its decision, the trial court found there was "perhaps a four-to-five minute delay in opening the gates" to cellblock L-1 as a result of CO Ward's failure to properly engage the override system.
 {¶ 8} Harris continued to assault plaintiff, seizing plaintiff's "PR-24," a carbonated plastic baton, and striking her twice. After striking plaintiff with the baton, Harris "kind of held the PR-24 in the air and began to parade around in a circle on the bottom range." (Tr. 56-57.) Harris then walked up the back stairs and held the baton in a "defensive action." Harris was eventually subdued when additional COs arrived in the cellblock area.
 {¶ 9} There was varying testimony regarding how long the assault lasted, as well as how much time transpired before the gates were opened following the radio dispatch for help. CO Albrecht, who heard plaintiff screaming when the attack began, estimated that the assault took approximately three and one-half minutes. Lieutenant Rogers stated that it was a matter of "minutes" from the time he heard the call on the radio until he was able to reach Harris and subdue him. CO Ward testified that approximately three or four seconds elapsed between the time she received the call that an officer was down and when the other CO entered the control booth and successfully activated the override switch. She estimated the assault did not last more than five minutes. Plaintiff, who estimated that she was knocked unconscious for two or three minutes during the incident, testified that the assault took "seven, eight, nine minutes, in that range." (Tr. 157.)
 {¶ 10} The trial court, in granting summary judgment in favor of defendant on plaintiff's intentional tort claim, found that, while defendant was negligent in not promptly opening the cell gates after CO Neal notified the control center that a CO was down in the L-1 cellblock area, such negligence was not a proximate cause of plaintiff's injuries because the inmate's attack could not have been avoided even if the cell gates had been promptly opened. The trial court further concluded that plaintiff had failed to prove any of the three elements of intent, as defined by the Ohio Supreme Court in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115, in order to prove an employer intentional tort claim.
 {¶ 11} On appeal, plaintiff sets forth the following two assignments of error for review:
 {¶ 12} "[I.] The decision of the court was against the manifest weight of the evidence.
 {¶ 13} "[II.] The court erred in concluding that appellant failed to prove the elements of intentional tort."
 {¶ 14} Defendant presents the following cross-assignment of error for review:
 {¶ 15} "The trial court erred as a matter of law by not holding that Appellant's claims were barred by the savings statute."
 {¶ 16} Plaintiff's two assignments of error are interrelated and will be considered together. Under these assignments of error, plaintiff contends the trial court erred in concluding that plaintiff failed to prove the elements of an intentional tort and that the court's decision was against the manifest weight of the evidence.
 {¶ 17} At the outset, we note "[t]he standard for assessing the manifest weight of the evidence in a civil case is whether the judgment is `supported by some competent, credible evidence going to all the essential elements of the case.' " Fernandez v. Anheuser-Busch, Inc., Franklin App. No. 01AP-1279, 2002-Ohio-3355, at ¶ 29, quoting C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. Further, "a reviewing court must be guided by the presumption that the findings of a trial court are correct, as the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Fernandez, supra, citing Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 18} The Ohio Supreme Court has defined an intentional tort as "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Jones v. VIP Development Co. (1984), 15 Ohio St.3d 90, paragraph one of the syllabus. In general, "the employer intentional tort is a narrow exception to the public policy in favor of Ohio's workers' compensation system." Estate of New v. Dairy Mart Convenience Stores, Inc. (July 16, 2001), Warren App. No. CA2000-11-097. Further, "[b]y setting this rigorous requirement of intent on the part of the employer, the Supreme Court declared that the standard was meant to limit the circumstances in which intent could be circumstantially inferred." Id.
 {¶ 19} In Gibson v. Drainage Products, Inc. (2002),95 Ohio St.3d 171, 174-175, the Ohio Supreme Court discussed the elements of an employer intentional tort action as follows:
 {¶ 20} "The law setting forth the necessary elements and level of proof required in order to demonstrate a workplace intentional tort is well established. In Fyffe, 59 Ohio St.3d 115 * * * we modified and explained the three-prong test originally set forth in Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100 * * * paragraph five of the syllabus, that an employee must satisfy in order to prevail on a workplace intentional tort claim against an employer. We held in Fyffe that `in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.' Id.,59 Ohio St.3d 115 * * * paragraph one of the syllabus.
 {¶ 21} "In paragraph two of the syllabus in Fyffe, we further outlined the proof necessary to establish intent on the part of the employer when we stated that '[t]o establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. * * * [T]he mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.' "
 {¶ 22} Plaintiff contends that the rescue effort by defendant's employees was delayed because CO Ward was unable to properly operate the override system due to lack of training; plaintiff maintains that had all of defendant's employees performed their jobs properly, she would have been spared the brunt of the assault. In asserting that the trial court's decision was against the manifest weight of the evidence, plaintiff challenges the trial court's finding that, "even if the LC-1 gate had been promptly opened, it was probable that no CO could have reached plaintiff until after the assault was over." Plaintiff also disputes the court's finding that the assault may have lasted from a minimum of 30 to a maximum of 90 seconds. Plaintiff contends that the facts of the case do not support these findings.
 {¶ 23} Upon review of the evidence, we find the trial court did not err in rendering judgment in favor of defendant on plaintiff's intentional tort claim. Plaintiff's manifest weight argument focuses upon the issue of how long defendant's employees were delayed in reaching plaintiff because of the failure of the gates to open promptly. This court, however, does not find that issue to be dispositive. Rather, even assuming that the gates could have been opened sooner, thereby allowing fellow COs to prevent much of the assault, the evidence falls short of showing defendant had knowledge that injury to plaintiff was substantially certain to occur.
 {¶ 24} Here, while defendant's failure to properly train one of its employees may have increased the likelihood that an incident could occur in which the override system would not be promptly activated, "the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Fyffe, supra, paragraph two of the syllabus. See, also, Mitchell v. Lawson Milk Co. (1988),40 Ohio St.3d 190, 192-193 (even if defendant failed to equip its stores with security devices or provide its employees with training in handling violent situations, "it does not follow that [defendant] knew that injury to its employees was certain, or substantially certain, to result"). In the present case, there was no evidence of any prior incidents in which an employee was unable to activate the override system, nor was there evidence that defendant had been warned of a dangerous condition but failed to take corrective measures. Further, assuming knowledge by defendant that one of its employees had not been properly trained to operate the override system, such evidence, at most, supports the trial court's finding that defendant negligently permitted an unsafe work condition to exist, but the facts are insufficient to impute intent or to prove defendant knew that plaintiff's injuries were substantially certain to occur under the circumstances. See Van Fossen, supra, at 117 (the mere failure of an employer to take corrective actions, even if characterized as "gross negligence" or "wantonness," does not constitute an intentional tort); Cope v. Salem Tire, Inc. (Mar. 20, 2002), Columbiana App. No. 2001 CO 10. ("Even if an injury is foreseeable, there is a difference between probability and substantial certainty.") Accordingly, the trial court did not err in finding that plaintiff failed to prove all the elements of an intentional tort.
 {¶ 25} This court recognizes that plaintiff was the victim of a brutal assault by an inmate; however, in the absence of an intentional act by an employer, the policy of Ohio is to compensate injured employees under the workers' compensation system. Estate of New, supra.
 {¶ 26} Based upon the foregoing, plaintiff's two assignments of error are without merit and are overruled; further, given our disposition of plaintiff's assignments of error, defendant's cross-assignment of error is rendered moot. Having overruled both of plaintiff's assignments of error, the judgment of the Ohio Court of Claims is hereby affirmed.
Judgment affirmed.
PETREE, P.J., concurs.
LAZARUS, J., concurs in judgment only.
 DECISION AND JUDGMENT ENTRY
{¶ 1} Appellee/cross-appellant, city of Bellevue, has filed a motion to strike the notice of appeal filed by appellant/cross-appellee, American Federation of State and County and Municipal Employees, AFL-CIO, Ohio Council 8 and Local 2517. Appellant/cross-appellee has filed a memorandum in opposition. The basis of appellee/cross-appellant's motion is that appellant/cross-appellee failed to include a proof of service on its notice of appeal stating that it served a copy of the notice on appellee/cross-appellant. Appellee/cross-appellant states that this proof of service is required by App.R. 13(D) and that without it, this court cannot consider the document and it must be stricken.
 {¶ 2} App.R. 13 states, in pertinent part:
 {¶ 3} "(B) Service of all documents required. Copies of all documents filed by any party and not required by these rules to be servedby the clerk shall, at or before the time of filing, be served by a party or person acting for the party on all other parties to the appeal. Service on a party represented by counsel shall be made on counsel.
 {¶ 4} "(C) * * *
 {¶ 5} "(D) Proof of service. Documents presented for filing shall contain an acknowledgment of service by the person served or proof of service in the form of a statement of the date and manner of service and of the names of the persons served, certified by the person who made service. Documents filed with the court shall not be considered until proof of service is endorsed on the documents or separately filed." (Emphasis added.)
 {¶ 6} Thus, pursuant to App.R. 13(B), if the clerk of courts is required to serve a copy of a document on the other parties, then the party filing the document need not also serve it. App.R. 3(E) requires the clerk of courts to serve a copy of the notice of appeal on the opposing party. This rule states:
 {¶ 7} "Service of the notice of appeal. The clerk of the trialcourt shall serve notice of the filing of a notice of appeal and, where required by local rule, a docketing statement, by mailing, or byfacsimile transmission, a copy to counsel of record of each party otherthan the appellant, * * *. Failure of the clerk to serve notice shall notaffect the validity of the appeal. * * *. " (Emphasis added.)
 {¶ 8} Since appellant/cross-appellee is not required to serve opposing counsel with a copy of the notice of appeal pursuant to App.R. 13(B), it is also not required to include a proof of service on its notice of appeal.
 {¶ 9} We find the motion to strike appellant/cross-appellee's notice of appeal not well-taken and it is denied.
Peter M. Handwork, P.J., Richard W. Knepper, J., Mark L. Pietrykowski,J., CONCUR.