JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, Theodore Rongers, a night security guard for defendant-appellee, University Hospitals of Cleveland, Inc. ("UH"), was terminated for sleeping on the job. Rongers claimed that medication he took following a heart attack made him sleepy and light-headed, necessitating periods of rest during work hours. He claimed this condition constituted a disability under R.C. 4112.01 and that UH knew of this disability but failed to reasonably accommodate it by allowing him to rest on the job. The court directed a verdict in UH's favor at the close of all evidence. Rongers appeals, arguing that disputed issues of fact precluded the directed verdict and that the court failed to engage in a thorough review of those facts. We find no error and affirm.
 I {¶ 2} Rongers, a sergeant on the night shift at UH hospitals, suffered a heart attack in February 2006. As part of his outpatient therapy, he took a drug called Coreg, a beta blocker designed to take pressure off the heart by lowering blood pressure and opening up peripheral veins and arteries. Rongers' cardiologist testified that Coreg can lower blood pressure and leave the patient light-headed, dizzy, or tired. The typical course of treatment with Coreg dictates incremental doubling of the dosage until the patient reaches the highest recommended dose. The cardiologist warned Rongers that an increased dose of Coreg might cause dizziness or lightheadedness in the first week, but that he *Page 4 
would adapt. If there were continued difficulties with the increased dosage, the cardiologist said that Rongers could "go back down [sic] what they were before." The cardiologist also testified that he relied on Rongers to inform him of any difficulties during the continued course of treatment following a heart attack. His patients were told that if they felt dizzy or light-headed with low blood pressure, they were to contact him "but cut down the dose in the meantime."
 {¶ 3} The cardiologist doubled Rongers' dose of Coreg in December 2006. The cardiologist noted that Rongers maintained horse stables, which he characterized as "heavy duty work," and that Rongers' blood pressure was good, so "it was a perfect time to increase the Coreg * * *." Rongers did not communicate any difficulties with the increased dose to the cardiologist.
 {¶ 4} Rongers said that the increased medication made him light-headed and tired. He had difficulty sleeping during the day and difficulty staying awake during his work hours. He communicated this difficulty to the chief of security and claimed that the chief told him "you can use my office. He says don't be sleeping in public." Rongers said he took the chiefs statement to mean that he could use the security office to sleep during work hours. UH disputed Rongers' characterization of the chiefs statement, and the chief testified that "if [Rongers] was feeling weak from his medication that he would have to let the dispatcher know where he was at, and if he was on a break or lunch, go ahead and use my *Page 5 
office, if he preferred to be private, but make sure that * * * the dispatcher knows where he is at and when he felt better, go ahead and get up."
 {¶ 5} Rongers said that he took naps "when needed" and at no time did he ask to be transferred to the day shift. UH documented three separate occasions when Rongers fell asleep while on duty: February 20, February 28, and March 6, 2007. The chief captured the February 20 instance on a hidden security camera placed near his secretary's desk. His secretary had repeatedly complained that someone had been moving things around on her desk, so he had a motion-activated camera covertly placed in the office. Upon review of the tape, the chief discovered Rongers had been sleeping in the office for 75 minutes. The security camera also showed Rongers sleeping on February 28, but the chief inadvertently erased the recording while attempting to transfer it to his computer. On March 6, another security officer told the chief that Rongers had been sleeping by the gun lockers for several hours.
 {¶ 6} Rongers admitted that he slept five or six times while on duty. He admitted that he slept for at least two hours on two separate occasions, testifying that he merely sat down at the desk of the chiefs secretary and simply fell asleep. Even though he claimed to be doing all he could physically to keep from falling asleep, he admitted that he might have turned the lights off before sitting down at the desk. Rongers justified the length of his naps by saying that the chief did not place any time restraints on him, although he did concede that *Page 6 
he had no way of saying for certain how long he slept on each occasion. Rongers said that his sleeping did not adversely affect hospital security because the dispatcher could wake him if his presence was immediately required.
 II {¶ 7} A directed verdict is reviewed in the same manner as a motion for summary judgment: after construing the evidence most strongly in favor of the party against whom the motion is directed, could reasonable minds come to but one conclusion upon the evidence submitted on a determinative issue and that conclusion is adverse to such party. See Civ. R. 50(A)(4). A motion for a directed verdict presents questions of law because the trier of fact cannot assess the sufficiency of the evidence, the weight of the evidence or the credibility of the witnesses. See Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, paragraph one of the syllabus. We review directed verdicts de novo, with no deference to the court's decision. Goodyear Tire Rubber Co. v.Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4.
 III {¶ 8} R.C. 4112.02(A) makes it an unlawful discriminatory practice for any employer, because of an employee's disability, to discharge the employee without just cause.
 {¶ 9} To prove a case of disability discrimination, the person seeking relief must demonstrate (1) that he or she was disabled, (2) that an adverse *Page 7 
employment action was taken by an employer, at least in part, because the individual was disabled, and (3) that the person, though disabled, can safely and substantially perform the essential functions of the job in question. Hazlett v. Martin Chevrolet, Inc. (1986),25 Ohio St.3d 279, 281. A failure to establish all of the elements of a prima facie case is fatal to a disability discrimination claim.
 A {¶ 10} The first prong of the prima facie test is whether Rongers is "disabled." Under R.C. 4112.10(A)(13), a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."
 {¶ 11} Rongers contends that his heart attack and the resulting permanent damage caused to his heart constituted a disability. He points to testimony by his cardiologist to the effect that his heart's "ejection fraction," a measure of how much blood is pumped by the heart, was only 35-40 percent.
 {¶ 12} The characterization of Rongers' ejection fraction is somewhat misleading. The cardiologist testified that a normal range of ejection was 50-80 percent, and he considered Rongers' heart to be only moderately weakened. While it is true that Rongers must now use Coreg indefinitely and that *Page 8 
drowsiness may be a side effect of that drug, "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."Burns v. Barnhart (C.A.3, 2002), 312 F.3d 113, 131.[1] The evidence showed that Coreg was not disabling because it improved Rongers' condition and allowed him to work, so his heart damage does not substantially limit him in any major life activity. Murphy v. UnitedParcel Serv., Inc. (1999), 527 U.S. 516. He therefore failed to show that his heart condition, as controlled by medication, constituted a disability. See Hill v. Kansas City Area Transp. Auth. (C.A.8, 1999),181 F.3d 891, 894 (hypertension not a disability when plaintiff controlled it for over 10 years with medications that permitted her to perform her job as a bus driver).
 {¶ 13} In any event, Rongers testified that his heart condition posed no bar to his ability to work as a security guard. When the cardiologist authorized Rongers to return to work, he did so without any restrictions. Rongers admitted as much, testifying at trial that from the time he returned to UH following his attack to the present he was under no restrictions, either at work or outside work. Throughout the relevant period and up to his termination, Rongers said that he maintained a 10-acre property with a stable and three horses. He also *Page 9 
admitted that he sometimes did part-time security work for his wife's employer while at the same time working for UH. He said that after his recovery from the heart attack, "I was doing everything I was doing before but slower, that's all."
 {¶ 14} It is plain that the permanent damage to his heart did not substantially limit Rongers from engaging in one or more major life activities. He continued to perform his job without restrictions and did the same strenuous work at home that he did before the heart attack. He even testified that he obtained new employment as a security guard following his termination from UH and experienced no difficulties, even though he worked second shift hours at that job. Rongers was not "disabled" as that word is defined by R.C. 4112.01(A)(13). He therefore failed to establish a prima facie case of disability discrimination.
 B {¶ 15} Even though Rongers' failure to establish that he had a disability justified a directed verdict, we choose to address the third element of the prima facie case[2] — whether Rongers was able to safely and substantially perform the essential functions of his job.
 {¶ 16} To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant restriction in the *Page 10 
ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Bridges v. City of Bossier (C.A.5, 1996), 92 F.3d 329, 334-336, citing Section 1630.2(h)(I), Title 29, C.F.R.; see, also, Meyers v. McGrath, Franklin App. No. 06AP-616,2007-Ohio-3228, ¶ 14.
 {¶ 17} Rongers admitted sleeping on the job meant that he was not performing his essential duties as a security guard. Rongers testified that an employer should not tolerate sleeping on the job. He said that he never held a job where it was acceptable to sleep while on duty and understood that when he did sleep on the job, he was not working. He further conceded that when he performed part-time security work outside of UH he actually discharged a member of his team for being asleep on the job. This evidence shows, as a matter of law, that Rongers could not safely and substantially perform his job duties when he required periods of sleep while on duty.
 {¶ 18} Despite this testimony, Rongers argues that his chief allowed him to use the security offices to nap as an "accommodation" to the side-effects of his heart medication.
 {¶ 19} In certain circumstances, an employer must accommodate an employee's disability unless the employer can demonstrate that an accommodation would impose an undue hardship on the conduct of the employer's business. Ohio Adm. Code 4112-5-08(E)(1). "Reasonable *Page 11 
accommodations" may take the form of job restructuring, which may consist, among other things, of realignment of duties. Ohio Adm. Code 112-5-08(E)(2). An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be "sufficiently direct and specific" to give the employer notice of the needed accommodation. Reed v. LePage Bakeries,Inc. (C.A.1, 2001), 244 F.3d 254, 261; Eisle v. Polyone, Inc., Lorain App. No. 03CA8248, 2003-Ohio-6577, ¶ 28.
 {¶ 20} We agree with UH that Rongers did not request an accommodation to his medication. Rongers testified that in a conversation with the chief, the chief asked "how it was going and I says I'm having a hell of a time staying awake at night * * * my medication is just kicking the hell out of me." He said the chief told him that "if you need to, he says you can use my office to take a nap."[3] Nothing in this exchange rises to the level of a direct and specific request for accommodation. *Page 12 
 {¶ 21} Moreover, an employee who requires extended periods of sleep while on the job cannot be performing the essential duties of the job.Cox v. Kettering Med. Ctr., Montgomery App. No. 20614, 2005-Ohio-5003, ¶ 23-24. In Bryne v. Avon Products, Inc. (C.A.7, 2003), 328 F.3d 379, the United States Court of Appeals for the Seventh Circuit addressed an argument similar to that offered by Rongers: Bryne could not stay awake at work due to depression and wished to be accommodated under the Americans with Disabilities Act by being allowed to sleep on the job. The Seventh Circuit rejected this argument, stating:
 {¶ 22} "The sort of accommodation contemplated by the Act is one that will allow the person to `perform the essential functions of the employment position'. Not working is not a means to perform the job's essential functions. An inability to do the job's essential tasks means that one is not `qualified;' it does not mean that the employer must excuse the inability." Id. at 381.
 {¶ 23} We acknowledge the seemingly contradictory position taken by UH in its handling of Rongers' situation — he was terminated for sleeping on the job even though the chief specifically told him to use the office to take a nap when necessary. But the chiefs permission for Rongers to "nap" implied only brief periods of rest as needed, not the hours of sleep that Rongers admittedly engaged in while on duty. Rongers conceded that he could not perform his job if he was sleeping while on duty, and he does not argue that UH had changed the conditions of his job by agreeing to pay him to sleep regularly while on duty. UH *Page 13 
could grant Rongers permission to take short breaks for naps based on his alleged medical condition, yet reasonably draw the line at the hour-long periods of sleep that Rongers claimed to have needed in order to perform his job. Reasonable minds could only find that Rongers' extended periods of sleep far-exceeded UH's permission to take naps as necessary. We find as a matter of law that Rongers failed to establish that he could safely and adequately perform his job of a security officer while under the influence of his medication.
 {¶ 24} The assigned errors are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, P.J., CONCURS `
FRANK D. CELEBREZZE, JR., J., CONCURS IN JUDGMENT ONLY
[1] In Plumbers Steamfitters Joint Apprenticeship Commt. v. OhioCivil Rights Comm. (1981), 66 Ohio St.2d 192, 196, the supreme court found that federal case law interpreting discrimination claims is generally applicable to alleged violations of R.C. Chapter 4112.
[2] There is no question that Rongers' termination constituted an adverse employment action; the second element of the prima facie case.
[3] UH disputed Rongers' characterization of the chief's offer, noting that the chief testified that he simply told Rongers that he could use the security office if he was on an unpaid lunch or break — not during work hours. At deposition, Rongers recalled a version of events more similar to the chief's trial testimony, recalling that the chief told him, "you can use my office. He says don't be sleeping in public." Rongers conceded in cross-examination that the chief's admonition "don't be sleeping in public" does not "say anything about work time. It just says don't be sleeping in public, okay."
Despite the contradictions between Rongers' trial and deposition testimony, for purposes of a motion for a directed verdict we must construe the evidence to show that the chief permitted Rongers to "nap" in the security office. See Gibson v. Drainage Products, Inc.,95 Ohio St.3d 171, 2002-Ohio-2008, fn. 4. *Page 1