[Cite as *Abrams v. Dept. of Rehab. & Corr.*, 2010-Ohio-1530.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MARDA J.  ABRAMS

Plaintiff

v.

DEPARTMENT OF REHABILITATION AND CORRECTION

Defendant

Case No. 2006-04679

Judge Joseph T. Clark

DECISION

{¶ 1}  Plaintiff brought this action alleging intentional tort.[1]  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}  On December 5, 2005, plaintiff was employed as a corrections officer (CO) at the Southern Ohio Correctional Facility (SOCF) where she was assigned as a relief officer in "J-Corridor," a long hallway which has four doors, each opening to a range where inmates are housed in cells.  The J-Corridor and its adjoining ranges comprise the "J-Block," a high-security segregation unit where inmate traffic is restricted.  Access to J-Block is controlled by two COs who are stationed in Control Center 3 (CC3) where they operate both the interior gates to J-Corridor and the four adjoined ranges and the exterior gates to other adjacent corridors.

{¶ 3}  On the day of the incident, COs Linda Foster and Terry Nicely were assigned to CC3, with Foster in charge of the exterior gates, and Nicely in charge of the

interior gates. A "metal detector officer" was also assigned to CC3 to screen all inmates who traveled through the area. Inmate Gary Hicks, a "4A" general population inmate who worked as a porter, was cleared through CC3 into J-Corridor to deliver trays of food to the inmates who were housed in J-Block.[2] Hicks was escorted to the J2-South range and strip searched before he was released to proceed without handcuffs to the food service area. Inmate porters were allowed to move freely throughout J-Corridor to carry food trays to and from the ranges.

**{¶ 4}** While Hicks was working in the food service area, plaintiff noticed that he was acting in a suspicious manner. Plaintiff did not know Hicks. When plaintiff advised CO John Little that Hicks was acting suspiciously, Little offered three times to conduct a pat-down search of Hicks, but plaintiff declined his offers. As the J-Corridor CO, plaintiff was required to pat down each porter who worked in J-Corridor before the inmate was allowed to leave J-Block to return to his living area. Plaintiff put on latex gloves before beginning to pat down Hicks.

**{¶ 5}** According to Hicks' deposition testimony, he turned toward plaintiff and knocked her to the floor with a single punch. Hicks then took plaintiff's PR24 tactical baton and struck her several times. According to both the surveillance video which shows Hicks shortly after the attack and a log that shows the time a "man-down" alarm was activated, the assault ended less than 12 seconds after it began; however, the video did not capture the assault. After she had been on the floor for 15 seconds, the "tilt" feature on the man-down alarm that plaintiff was carrying automatically actuated to send a distress signal. Within seconds after the assault was over, nurse Jenkins, a psychiatric nurse who was working on a range in J-Block, looked out into J-Corridor and saw that plaintiff was on the floor and that Hicks was holding a PR24. Jenkins called for assistance by manually activating his man-down alarm. Jenkins' man-down alarm alerted Control Center One to dispatch the "contingency team" to the scene.

**{¶ 6}** Nicely testified that he looked up from his post in CC3 and observed Hicks standing over plaintiff and striking her with the PR24. Nicely used the intercom system

---

[1]On December 8, 2006, the court issued an entry granting defendant's motion to dismiss plaintiff's negligence claim.

to call COs on the range for assistance and he opened the interior doors in J-Block to allow responding COs to enter J-Corridor.  Foster also observed Hicks strike plaintiff either one or two times.  According to Foster, she opened the exterior gates and, at about the same time that she heard the man-down alarm sound, she "hollered" on the intercom to COs in the halls outside of CC3.

{¶ 7}   According to Darrold Clark, the shift captain at the time of the incident, 23 staff members responded to the incident.  The officers who responded discovered that Hicks had left J-Corridor and entered an adjacent range, J-2 North.  Clark testified that 13 COs were required to use force to subdue Hicks, who was six feet, five inches tall, and weighed approximately 350 pounds.  Plaintiff was transported to a local hospital for treatment.

## STATUTORY STANDARD

R.C.  2745.01, addresses an employer's liability for an intentional tort and provides, in pertinent part, as follows:

"(A)   In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

"(B)   As used in this section, 'substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

"(C)   Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result."

---

[2]Unlike inmates in general population who eat in the institution dining room, inmates who are housed in J-Block receive their meals from inmate porters who distribute trays that have been prepared in the food service area.

Plaintiff contends that R.C. 2745.01 is unconstitutional and that the common law of intentional tort should be applied in making a determination as to liability in this case.[3] Plaintiff further asserts that if R.C. 2745.01 is determined to be constitutional, then section (C) would apply in this case to create a rebuttable presumption of intent to injure.

"In the absence of controlling precedent, [Ohio courts] should accord R.C. 2745.01 the presumption of constitutionality to which it is entitled." *Smith v. Inland Paperboard & Packaging, Inc.*, Portage App. No. 2008-P-0072, 2009-Ohio-3148, ¶33, citing *State v. Warren*, 118 Ohio St.3d 200, 2008-Ohio-2011, at ¶21 (finding that a statute "enjoy[s] a strong presumption of constitutionality" and "will be upheld unless the challenger can meet the burden of establishing beyond a reasonable doubt that the statute is unconstitutional"). (Citations omitted.)

With regard to R.C. 2745.01(C), plaintiff asserts that defendant had "deliberately removed" 14 "safety guards" that SOCF had used prior to the assault on plaintiff to protect prison employees. According to plaintiff, such safety guards included certain CO post positions, inmate security classifications, institution policies, and security devices. Plaintiff asserts that the response to the assault was slow because COs, including members of the "contingency team," were away from their assigned posts and that she would not have sustained such serious injuries had those COs properly performed their duties. Specifically, plaintiff argues that the "metal detector" CO was required to remain in CC3 at all times and that escort officers were intentionally absent from their posts. Plaintiff also asserts that the COs who were assigned to CC3 further delayed the response to the incident inasmuch as they did not know the whereabouts of either the metal detector or contingency team members at the time of the incident.

Contrary to plaintiff's assertion, the testimony showed that the metal detector CO was responsible for monitoring the metal detector and the entryway to CC3, but that he was not responsible for guarding the J-Corridor and, in fact, the area where the attack occurred was not visible from that post. Furthermore, the contingency team members were responsible for responding to a man-down alarm, but they neither intended to nor were able to act as an "equipment guard" to prevent an assault.

---

[3]The constitutionality of the statute is currently under review by the Supreme Court of Ohio. See

Plaintiff has not presented any legal authority to support her argument that the General Assembly intended the term "equipment safety guard," as used in R.C. 2745.01(C), to include such items as department policies, employee positions, or the use of monitoring devices. Rather, Ohio courts have consistently found that the term "equipment safety guard" refers to physical devices that were designed to protect operators from the risk of harm inherent in the use of machinery and industrial equipment. See *Smith*, supra; *Warren v. Libbey Glass, Inc.*, Lucas App. No. L-09-1040, 2009-Ohio-6686; *Shanklin v. McDonald's USA, LLC*, Licking App. No. CA 00074, 2009-Ohio-251. Accordingly, the court finds that plaintiff's reliance on R.C. 2745.01(C) is misplaced.

Even if the court were to accept plaintiff's argument with regard to any of the items she has identified as "equipment safety guards," the court finds that the evidence presented rebuts any presumption that the removal of such items was committed with the intent to injure plaintiff. For instance, plaintiff was especially critical of defendant's decision to reduce staffing in J-Corridor to one CO; however, the evidence showed that CO post assignments were made according to a "pick-a-post" agreement between defendant's management and the COs' labor union, and that the agreement was the result of budgetary considerations. The court finds that defendant's decisions regarding the deployment of staff and security devices resulted from safety concerns and financial constraints, rather than any disregard by defendant for the safety of its staff. Thus, defendant has successfully rebutted any presumption that may have arisen pursuant to R.C. 2745.01(C) that defendant's actions or inactions were the result of an intent to injure plaintiff.

Plaintiff next contends that defendant was on notice of Hicks' "violent tendencies" inasmuch as Hicks had assaulted an inmate at another institution and that defendant deliberately removed certain safeguards which could have either prevented or reduced the severity of Hicks' assault on plaintiff. The Tenth District Court of Appeals has applied the definition of "substantially certain" set forth in R.C. 2745.01(B) and held that an employer will only be liable for a claim of employer intentional tort if the employee proves that the employer had "knowledge of the existence of a dangerous condition"

---

*Kaminski v. Metal & Wire Prods. Co.*, 119 Ohio St.3d 1407, 2008-Ohio-3880.

and that the employer acted with substantial certainty which is defined as "deliberate intent" to cause the employee to suffer an injury. *Weimerskirch v. Coakley*, Franklin App. No 07AP-952, 2008-Ohio-1681, ¶8, citing *Gibson v. Drainage Products, Inc.*, 95 Ohio St.3d 171, 2002-Ohio-2008 (finding that an employer was not liable for a claim of intentional tort which was brought by an employee who was viciously assaulted by another employee). It is the 'substantially certain' requirement that is most often at issue." Id.

With regard to defendant's knowledge of the existence of a dangerous condition, it is undisputed that Hicks had never threatened or assaulted a CO during his term of incarceration. Furthermore, the testimony established that defendant's COs had regarded Hicks as a responsible worker and a well-behaved inmate who was respectful to defendant's staff.

As to defendant's knowledge that plaintiff was substantially certain to be harmed if she was subjected to direct contact with inmate Hicks, Captain Clark testified that it was not common for an inmate to attempt to assault a CO during a pat down search; however, COs were frequently reminded to be vigilant whenever they were in the presence of inmates. The testimony showed that plaintiff was an experienced and capable CO who was well aware of the risks involved in working at SOCF. Plaintiff acknowledged that she had worked at SOCF for five years prior to the incident and she was aware that the institution housed "the worst of the worst" inmates. Although plaintiff observed Hicks acting suspiciously just prior to the assault, she refused several offers of assistance to search Hicks.

In short, the evidence presented does not show that defendant acted with deliberate intent to injure plaintiff. Accordingly, plaintiff cannot prevail on her claim of intentional tort pursuant to R.C. 2745.01.

**COMMON LAW STANDARD**

In the event that R.C. 2745.01 is declared unconstitutional, the court would be required to analyze plaintiff's claims under the common law test for intentional torts. See *Kaminski*, supra; *Jefferson v. Benjamin Steel Co.*, Richland App. Nos. 09 CA 62 & 09 CA 75, 2010-Ohio-50, ¶74. In order to prevail under the common law test for an

employer intentional tort, plaintiff must prove: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, paragraph one of the syllabus.

Cases involving workplace intentional torts must be judged on the totality of the circumstances surrounding each accident. *Gibson*, at ¶27. The focus is the employer's knowledge of the risk of injury. *Shanklin*, supra, at ¶30. The employee must show that the employer possessed "actual knowledge" that injury to the employee was a substantial certainty. *Sanek v. Duracote Corporation* (1989), 43 Ohio St.3d 169, 172. "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. * * * [T]he mere knowledge and appreciation of a risk--something short of substantial certainty--is not intent." *Fyffe*, paragraph two of the syllabus. Thus, under the first prong of the *Fyffe* test, plaintiff must prove that defendant had actual knowledge of the existence of the specific dangerous condition that caused her injury. "[D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." *Naragon v. Dayton Power & Light* Co. (Mar. 30, 1998), Shelby App. No. 17-97-21. "Were it otherwise, any injury associated with inherently dangerous work * * * could subject an employer to intentional tort liability, whatever the cause." Id.

As stated above, Hicks had never before threatened or assaulted a CO and he was known to be respectful to defendant's staff. Even if Hicks was considered to be a dangerous instrumentality, there is no evidence that he was substantially certain to injure plaintiff. Plaintiff also failed to prove that defendant had been warned of a dangerous condition but failed to take corrective action.

Even assuming that defendant was aware of the existence of a dangerous condition and that the defendant could have reasonably utilized policies and equipment

which would have allowed its COs to respond sooner and stop the assault, the evidence does not show that defendant had knowledge that injury to plaintiff was substantially certain to result. The testimony showed that it was a routine practice for COs to "shake down" inmates and that it was it was improbable for an inmate, particularly an inmate porter, to assault a CO during such a search.

The Supreme Court of Ohio has held that where an employer failed to equip its facilities with security devices or provide its employees with training in handling violent situations, "it does not necessarily follow that the employer knew that injury to its employee was certain, or substantially certain, to result." *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192-193. "Without more, an employer's knowledge and appreciation of the risk 'is insufficient to impute knowledge with substantial certainty that [the] harm would befall its employees.'" *Singleton v. Ohio Concrete Resurfacing, Inc.*, Franklin App. No. 06AP-991, 2007-Ohio-2012, ¶34, quoting *Richard v. Mr. Hero, Inc.* (Mar. 8, 1989), Summit App. No. 13701.

For the foregoing reasons, the court finds that plaintiff has failed to provide sufficient evidence to establish intent for the purpose of proving the existence of an intentional tort claim. Accordingly, judgment shall be rendered in favor of defendant.


# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


MARDA J. ABRAMS

　　Plaintiff

　　v.

DEPARTMENT OF REHABILITATION AND CORRECTION

　　Defendant
　Case No. 2006-04679

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Eric A. Walker                          James B. Blumenstiel
Peter E. DeMarco                        261 West Johnstown Road
Assistant Attorneys General             Columbus, Ohio 43230
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Thomas P. Maroney
608 Virginia Street East
Charleston, West Virginia 25301

AMR/cmd/Filed March 22, 2010/To S.C. reporter April 5, 2010