OPINION
{¶ 1} Plaintiff-appellant Jeff Woodell appeals the decision of the Monroe County Common Pleas Court granting summary judgment in favor of defendants-appellees Ormet Primary Aluminum Corporation, R. Emmett Boyle, Gary Mallet, Greg Driscoll, Roy Schweinsburg, Chuck Rogalski, and John Doe Management Employees (collectively referred to as Ormet). Woodell is also appealing the trial court's grant of summary judgment in favor of defendants-appellees United Steelworkers of America, AFL-CIO-CLC, United Steelworkers of America, District 1, United Steelworkers of America, Local Union 5724, David McCall, Kenny Cozart, Terry Bratton, Ronnie Blatt, Donnie Blatt and Bill Brooks (collectively referred to as Union). This is a continuation of Woodell v. Ormet PrimaryAluminum Corp., 156 Ohio App.3d 602, 2004-Ohio-1558. In that case, we addressed the issues raised as to the Union, however, due to Ormet's filing of bankruptcy we were prohibited from addressing all issues related to Ormet until the bankruptcy dispute was resolved or when the automatic stay issued by the bankruptcy court was lifted. On December 29, 2004, the United States Bankruptcy Court issued an order relieving the stay. On January 26, 2005, the case was reinstated to this court's docket for final determination of the issues raised against Ormet. Thus, the only issues raised in this opinion are the issues as to Ormet. For the reasons expressed below, the trial court's grant of summary judgment for Ormet is hereby affirmed. However, the trial court's order that court costs are assessed against Woodell is reversed.
 STATEMENT OF FACTS {¶ 2} Ormet is a large corporation that operates an aluminum smelter in Monroe County, Ohio. The Union is the collective bargaining representative of product and maintenance employees of Ormet. Boyle, Mallet, Driscoll, Schweinsburg, and Rogalski are all upper-level management at Ormet. McCall, Cozart, Bratton, Ronnie Blatt, Donnie Blatt, and Brooks are all representatives of the Union.
 {¶ 3} In May of 1999, Ormet and the Union began having problems related to the collective bargaining agreement, which had expired. In an attempt to get the terms of the contract that they wanted, the Union members engaged in chanting while entering and exiting the plant (sometimes referred to as "in plant" strategy), placing signs at the entrance of the plant and writing graffiti on Ormet property. The language used in the chants, signs, and graffiti that referred to the labor dispute were "COLA" "Pension" and "Fair Contract." However, some of the chanting, signs, and graffiti were directed toward individual salaried employees.
 {¶ 4} Woodell was employed by Ormet as a front line supervisor from August 1996, until his termination in July of 2001. During the time of the labor dispute, Woodell was a pot line supervisor on C shift. As a pot line supervisor he was a low-level salary employee and, as such, was not a member of the union but was required to work closely with hourly union employees. Woodell was one of the salaried employees that chants, signs, and graffiti were directed towards.
 {¶ 5} The chants, signs, and graffiti referred to Woodell personally and sometimes involved his family. For example, the union employees chanted, "Woodell must go" and "One day Woodell will pay." (Woodell Depo. 94; Schweinsberg Depo. 53 — Schweinsberg was the production manager at Ormet). Also, graffiti in the plant stated "The only good Woodell is a dead Woodell." "Match in the gas tank, boom, boom Woodell." (Woodell Depo 82). "Woodell's wife takes it up the ass from Roy while Rogalski watches." (Roy and Rogalski are upper level management). "Jenny's pussy stinks." (Jenny is Woodell's wife). "Hey, Woodell, who is the daddy," (referring to who is the father of his toddler son). "Young Woodell says mom sucks good cock while dad is at work." And, "Shoot Woodell." The signs posted at the entrance of the plant stated, "Woodell is a disease — 5724 is the cure" (5724 is the local union number). Strike Log 08/21/99. Another sign posted at the entrance of the plant stated "your move pizza man." (Woodell ran a pizza shop in town). (Driscoll Depo. 86 Driscoll was Corporate Industrial Relations Director).
 {¶ 6} Besides the chanting, signs, and graffiti, Woodell asserts that four confrontations occurred between him and the hourly employees. One occurred between Woodell and Brooks where Brooks drove closely behind Woodell with a hot metal truck. Two of the other incidents were a large group of employees following and chanting at Woodell. The last confrontation occurred on April 3, 2000, when a group of hourly employees congregated in the area around the shower room. Upon Woodell's approach to the shower room, the group of hourly employees were chanting and coming towards him. Two other supervisors came upon Woodell and helped him exit the area before any physical contact occurred between the hourly employees and Woodell. Three employees were terminated for their conduct; however, they were reinstated within three weeks of the termination.
 {¶ 7} As a result of all these occurrences, Woodell began to miss work because of the physical effect the stress of the labor dispute was having on him. Woodell asked to be moved to another job, but Ormet could only move him to another shift and pot line. (Debra Boger Depo. 85 — Boger was vice president of Administrative Services). Woodell refused this option. (Woodell 03/26/03 Depo. 414). Due to the stress and the physical effects the labor dispute was having on him, on May 5, 2000, Woodell took a leave of absence from his job. (Woodell 03/26/03 Depo. 454). Woodell began seeing doctors and was diagnosed with post-traumatic stress disorder.
 {¶ 8} The labor dispute was resolved in the end of May 2000, with a new contract being signed between Ormet and the Union. It appears that Ormet began looking into whether Woodell could return to work in January of 2001, after a report was made that he was working in the pizza shop that he owned. Ormet then ordered an independent medical examination (IME). The IME concluded that Woodell was well enough to return to work. Following this recommendation, Ormet ordered Woodell to report back to work on July 23, 2001. Woodell consulted with his own doctors prior to reporting to work and was informed that he was not well enough to work. Following his doctor's recommendation, Woodell reported off and then was terminated from his employment with Ormet.
 {¶ 9} In April of 2001, Woodell filed suit against Ormet and the Union asserting six causes of action. The causes of action asserted against Ormet that are at issue in this appeal are the employer intentional tort cause of action, the public policy tort cause of action and a claim of spoliation of evidence. As stated above, the causes of action asserted against the Union were addressed in Woodell, 156 Ohio App.3d 602,2004-Ohio-1558. After discovery, the Union and Ormet filed motions for summary judgment. The trial court granted the motions on all counts. Woodell timely appeals from that decision raising one assignment of error.
 ASSIGNMENT OF ERROR {¶ 10} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co.,77 Ohio St.3d 102, 1996-Ohio-336. Summary judgment is properly granted when (1) no genuine issue as to any material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C). The evidence must be viewed in the light most favorable to the nonmoving party. If a movant desires to obtain summary judgment, it should point the court towards the portions of the record which can include pleadings that demonstrate the absence of a genuine issue for trial. Dresher v. Burt,75 Ohio St.3d 280, 293, 1996-Ohio-107. To avoid summary judgment, the nonmovant cannot rest on the mere allegations of the pleadings but must set forth specific facts by affidavit or otherwise showing a genuine issue for trial. Id.
 {¶ 11} Woodell's first argument is twofold. First, he contends that the trial court improperly granted summary judgment for Ormet on the employer intentional tort cause of action. Secondly, he contends that the trial court improperly granted Ormet summary judgment on the public policy tort cause of action. Woodell's next argument is that the trial court erred in denying his Motion for Sanction of Judgment on the spoliation of evidence claim. Lastly, Woodell argues that issue with some of the trial court's other decisions. Each will be addressed separately.
 A. Summary Judgment Issues {¶ 12} As was explained in Woodell, 156 Ohio App.3d 602,2004-Ohio-1558, at ¶ 13, Woodell named numerous management employees in the complaint and in this appeal. However, while he sued these management employees of Ormet in both their "representative" and individual capacities, it is clear from the record that he has advanced no theories (to the trial court or this court) against these employees as individuals. Rather, every cause of action and argument that involves them revolves solely around their status as Ormet employees. Thus, the causes of action and arguments asserted against these management employees are in actuality being asserted against Ormet and, thus, will solely be treated as the action against Ormet.
 1. Employer Intentional Tort {¶ 13} The Ohio Supreme Court has set out a tripartite test that an employee must prove to prevail on an intentional tort claim against an employer. Fyffe v. Jeno's Inc. (1991), 59 Ohio St.3d 115. First, the employee must prove the employer had knowledge of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation. Id. Second, the employer must have knowledge that if the employee is subjected by the employment to such dangerous process, procedure, instrumentality, or condition, then harm to the employee will be a substantial certainty. Id. Third, the employer, under such circumstances and with such knowledge, did act to require the employee to continue to perform the dangerous task. Id. Proof of the three elements necessary to establish an intentional tort may be made by direct and/or circumstantial evidence. Hannah v. Dayton Power Light Co.,82 Ohio St.3d 482, 487, 1998-Ohio-408.
 {¶ 14} The first element of Fyffe requires the employer to know of the dangerous condition within its business operation. The trial court determined that Woodell did not satisfy the first element of Fyffe.
 {¶ 15} Review of the voluminous deposition testimony reveals that Ormet did have knowledge of some of the chanting, signs, and graffiti that concerned Woodell. (Schweinsberg Depo. 43, 53 — Schweinsberg was Production Manager; Driscoll Depo. 14 — Driscoll was Corporate Industrial Relations Director; Rogalski Depo. 10, 15 — Rogalski was Ormet Superintendent; Boyle Depo. 86 — Boyle was CEO of Ormet; Mallett Depo. 19, 25, 51 — Mallet was Reduction Division Manager; Mike Dickerson Depo. 21, 22 — Dickerson was Woodell's direct supervisor; Lisa Riedel Depo. 30-31 — Riedel was Personnel Supervisor). However, not all upper level management was aware that the graffiti being written referenced Woodell's family. (Driscoll Depo. 20; Schweinsberg Depo. 43, 44; Rogalski Depo. 8-9, 30; Mallett Depo. 59, 75). Dickerson, Woodell's direct supervisor, was the only one who saw graffiti that stated, "Woodell's wife takes it up the ass from Roy while Rogalski watches," and "Jenny's pussy stinks." (Dickerson Depo. 151). Regardless of whether Ormet was aware of the graffiti about Woodell's family, it was aware that the chants and graffiti were directed at Woodell and his body. (Boyle Depo. 86; Rogalski Depo. 24, 28; Schweinsberg Depo. 43). Therefore, Ormet knew of the condition. However, they dispute whether it was a dangerous condition.
 {¶ 16} Deposition testimony reveals that not all of the upper level management viewed the chanting, signs, and graffiti as a dangerous condition because it was occurring to a majority of upper level management. For instance, Boyle stated that there a was a lot of graffiti written about him such as "Kill Boyle," and that he has seen life threatening graffiti about Driscoll at the plant. (Boyle Depo. 86, 87). Mallett confirmed that "Kill Emmett Boyle" was written on a bathroom wall at one point in time during the contract dispute. (Mallett Depo. 19). Mallett also testified that he saw graffiti that stated that Driscoll and Schweinsberg must go. (Mallett Depo. 33). Along those same lines, he saw his name written around the plant. (Mallett Depo 33). Dickerson heard the union employees chanting, "Dickerson must go." (Dickerson Depo. 22). Driscoll stated that he was aware of hundreds of graffiti incidences between the time that the contract dispute began until the time the contract dispute ended that involved various people. (Driscoll Depo. 14). Schweinsberg stated that graffiti was written about him to the effect that "Roy boy must go. Remember Jimmy Rider. Who's next murdered. Roy sucks." (Schweinsberg Depo. 21).
 {¶ 17} The majority of management did not view the atmosphere that was created by the labor dispute as dangerous. Mallet described the working environment during the labor dispute as distracting and irritating, but not volatile. (Mallet Depo. 18). Rogalski stated that during the labor dispute in question he did not recall anybody fearing that somebody was going to get shot. (Rogalski Depo. 24). Schweinsberg stated that he would not characterize the atmosphere in the plant as highly volatile. (Schweinsberg Depo. 15). Driscoll stated that he did not feel that there was any physical threat of violence, but rather the union employees were "just being a major league pain in the butt." (Driscoll Depo. 90). However, Dickerson described the plant as being like a powder keg; that something was going to happen eventually. (Dickerson Depo. 52).
 {¶ 18} When viewing the evidence in the light most favorable to Woodell, we must conclude that there is a genuine issue of material fact as to whether the condition was dangerous. Ormet knew of the chanting and graffiti. It knew that these were directed at Woodell and his body. Even though high-level management did not view this as a volatile situation, Woodell's direct supervisor did. Woodell believed that it was a volatile situation and that he was at risk of being attacked or injured. Thus, the first element of the Fyffe test would survive summary judgment.
 {¶ 19} Therefore, our analysis turns to the second element of Fyffe.
Under the second element, the employer must know that there is a substantial certainty of harm to the employee from the dangerous condition. The fact that there is a high risk of harm or that the risk is great does not necessarily mean the act was intentional; mere knowledge and appreciation of a risk is not intent. Fyffe, 59 Ohio St.3d 115. In most instances those acts could be correctly viewed as reckless. Id. at 117. The key is whether there is a substantial certainty of harm. In order to prove this, a plaintiff must show the level of risk-exposure was egregious. Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169, 172. An employer may be liable for the consequences of its act even though it never intended a specific result. Gibson v. Drainage Products, Inc.,95 Ohio St.3d 171, 179, 2002-Ohio-2008.
 {¶ 20} During Woodell's deposition the following colloquy occurred:
 {¶ 21} "Q. Now, the Ormet defendant's, they're not psychologists, are they, to the best of your knowledge?
 {¶ 22} "A. Not — to the best of my knowledge, no.
 {¶ 23} "* * *
 {¶ 24} "Q. Given the fact that — well, there being no indication that anybody else who has been a member of Ormet management has ever sustained PTSD as a result of conduct by employees at Ormet's facility, and given the fact that the individual defendants in their individual capacity or as a representative of Ormet Primary aren't psychologists, they could not have been substantially certain that the conduct about which you're complaining was substantially certain to result in you sustaining this injury in the form of PTSD, could they?
 {¶ 25} "* * *
 {¶ 26} "A. I don't know what they were aware of. I don't know what training upper management got in regards, so I can't answer that.
 {¶ 27} "* * *
 {¶ 28} "Q. I'm not trying to trick you. I'm trying to get to the truth here. You don't have any information, do you, Jeff, that would lead you to conclude that the Ormet defendants were substantially certain that the conduct about which you're complaining in your lawsuit would cause you to sustain your alleged PTSD injury?
 {¶ 29} "A. I am sure that, at some level of management, hopefully Ormet's responsible enough to tell the people things that can cause damage to people. I mean, if not, I would be shocked. I mean, I would think, you know, that they would be informed the things that could happen to people under constant harassment and threats and —
 {¶ 30} "Q. Well, I'm not asking, Jeff, whether they thought there might be some risk, some degree of risk, that you would be injured by this conduct.
 {¶ 31} "A. Okay.
 {¶ 32} "Q. That's why I'm asking you, Jeff, do you have any information that would indicate that they had to be substantially certain, rather than just know there's a risk, substantially certain that you were going to be sustaining this PTSD injury as a result of the conduct about which you're complaining?
 {¶ 33} "A. I don't know what they had." (03/26/03 Woodell Depo. 410-414).
 {¶ 34} Ormet argues that the above testimony is an admission by Woodell that he did not know what information could have made the Ormet defendants "substantially certain" that he would suffer from the posttraumatic stress disorder. Thus, according to Ormet, the second element of Fyffe is not met.
 {¶ 35} We disagree. When viewing the above information in the light most favorable to Woodell, the above statement is not an admission. Rather, it is Woodell explaining that he was not aware what Ormet knew or did not know. If he had stated that he knew they did not have any information that the injury was substantially certain to occur that would be an admission. However, the colloquy here does not resemble such an admission. Thus, we must now turn our analysis to the third element ofFyffe.
 {¶ 36} The third element of Fyffe is that the employee was required to perform the dangerous task. The third element is satisfied by presenting evidence that raises an inference that the employer, through its actions, and policies required the employee to engage in that dangerous condition. Hannah, 82 Ohio St.3d at 487.
 {¶ 37} First, regarding the graffiti, Ormet did not require Woodell to work with it written around him. Ormet had a strict policy that if graffiti was written anywhere in the plant a supervisor had the authority to order his employees to erase or paint over the graffiti. Boyle, in his depositions, stated that the supervisor in a department is responsible to police graffiti and also is responsible to get rid of it if it appears. (Boyle Depo. 41, 50). Mallett testified that the standard practice is for the graffiti to be immediately painted over or erased if it is written in chalk. (Mallett Depo. 34). Schweinsberg also stated that the policy was to either remove it yourself or order an hourly employee to remove it. (Schweinsberg Depo. 21, 47). Rogalski stated that he was instructed to have graffiti removed, regardless of what type of graffiti it was. (Rogalski Depo. 30). Dickerson also testified that he was instructed to have hourly employees paint over any graffiti that was found. (Dickerson Depo. 93). Woodell admitted in his testimony that he had the authority to paint over the graffiti immediately. (Woodell 01/15/02 Depo. 230, 03/26/03 Depo. 443-445). Woodell further stated that he was not going to go down there and paint the graffiti over day after day. (Woodell 01/15/02 Depo. 231). He felt that taking that action was ridiculous. (Woodell 01/15/02 Depo. 231-232). He would not give the union personal satisfaction of seeing him down there painting it over. (Woodell 01/15/02 Depo. 231-232). Woodell also admits that most of the graffiti he complained of was removed, however, in his opinion it was not removed quickly enough. (Woodell 01/15/02 Depo. 291).
 {¶ 38} Therefore, even when viewing the evidence in the light most favorable to Woodell, he was not required to work with all this graffiti around. In fact, he had the right and was expected to have it removed immediately once he noticed it. Additionally, Ormet stated that if any person was caught writing graffiti on plant property the person would be disciplined. (Boyle Depo. 50). However, Ormet was unable to catch any individual writing graffiti. Regardless, Woodell was not required to work in an atmosphere full of graffiti.
 {¶ 39} Furthermore, the one bathroom that was constantly a site of graffiti was temporarily locked up so that employees could not use this bathroom. It was also locked up for the purpose of cleaning up the graffiti. Therefore, since the bathroom was not available to be used, Woodell was not required to use a bathroom where derogatory statements were written about him.
 {¶ 40} Secondly, regarding the chanting of Woodell must go, we concluded in Woodell, 156 Ohio App.3d 602, 2004-Ohio-1558, at ¶ 26, that the Union members chanting this was protected activity under Federal Law. As such, Ormet could not prohibit activity that was authorized by the law.
 {¶ 41} Furthermore there is other additional evidence that Woodell was not required to work in the dangerous condition. Woodell asked for a different work assignment within the plant. (Boger Depo. 85). Ormet tried to accommodate the request; Woodell was offered a job on another pot line or shift. (Boger Depo. 85; Riedel Depo 49-50). This was the only option in the plant that was available at that time. (Riedel Depo. 49-50). Woodell refused this option. (Woodell 03/26/03 Depo. 414). He explained that moving to another shift would put him in greater danger because he would not know what hourly people to worry about. (Woodell 03/26/03 Depo. 415). However, if he was placed on A shift instead of C shift more upper level management would have been around, since upper level management works during the A shift. Therefore, it seems logical that the hourly employees would be on better behavior during this shift. Thus, Woodell was not required to work in the dangerous condition because he had the option of moving to another shift.
 {¶ 42} Finally, employees were discharged for some of their conduct towards Woodell. For example, the employees who came upon him while he was going to the shower room were terminated from their employment. Although they were reinstated after approximately three weeks, this was due to arbitration, which was in the contract with the employees that Ormet and the employees agreed to abide by through the labor dispute.
 {¶ 43} Therefore, when viewing all of the information in the light most favorable to Woodell, Ormet did not require Woodell to work with the dangerous condition. The trial court's grant of summary judgment on the employer intentional tort was correct; Woodell did not establish his threshold burden.
 2. Public Policy Tort {¶ 44} In addition to granting summary judgment on the employer intentional tort cause of action, the trial court also granted summary judgment on the public policy tort cause of action, i.e. wrongful discharge. Under Ohio law, at-will employees may be discharged by their employer for any reason, or no reason at all, provided that their termination is not contrary to public policy. Collins v. Rizkana,73 Ohio St.3d 65, 67-68, 1995-Ohio-135. It is undisputed that Woodell was an at-will employee. Thus, in order to assert a successful cause of action for damages, Woodell must show that his discharge was wrongful, i.e. the discharge was contrary to public policy.
 {¶ 45} To establish a wrongful discharge claim, four elements must be proven. Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134, 151,1997-Ohio-219. First, there must exist a clear public policy that is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law. Id. (characterizing this first element as the clarity element). Second, dismissal under the alleged circumstances must jeopardize the public policy. Id. (characterizing the second element as the jeopardy element). Third, the employee's dismissal must be motivated by conduct related to the public policy. Id. (characterizing the third element as the causation element). Finally, there must be no overriding legitimate business justification for the dismissal. Id. (characterizing the fourth element as the overriding justification element). The clarity and jeopardy elements are questions of law to be determined by the court, and the causation and overriding justification elements are questions of fact for the jury. Id.
 {¶ 46} In Woodell's complaint, he claims a public policy tort against Ormet for ordering him back to work and terminating him for initiating the legal process, i.e. contacting an attorney and having the attorney send a letter to Ormet about the pending litigation. The clarity element is clearly met to the extent that there does exist a public policy that an employee should not be terminated for contacting an attorney. The First Appellate District has explained:
 {¶ 47} "In holding that there was a clear public policy in favor of an employee consulting with counsel, we cited three identifiable sources of public policy encouraging such consultation: Section 16, Article I of the Ohio Constitution, which requires that all courts be open for redress of a citizen's injury; Ethical Considerations 1-1 and 2-1 of the Ohio Code of Professional Responsibility, which state that all persons should have ready access to legal representation; and the common law, which recognizes the need for legal representation for the redress of wrongs."Taylor v. Volunteers of Am., 1st. Dist. No. C-020651, 2003-Ohio-4306, ¶9 (internal citation omitted).
 {¶ 48} Under the second element, Woodell must show that the dismissal under the alleged circumstances would jeopardize the public policy. This argument is fact specific.
 {¶ 49} In January or February 2001, Debby Nisley, Ormet's Personnel Manager, reported to Ormet that she saw Woodell working, specifically answering phones in the pizza shop attached to his house. (Gilmore Depo. 20-21). This was reported to Ormet and an investigation occurred as to whether Woodell was or was not working while receiving disability benefits. (Gilmore Depo. 22). The investigation was inconclusive. (Gilmore Depo. 22). Ormet then decided to send Woodell for an IME. (Gilmore Depo. 22-23). The decision to send Woodell for an IME was made immediately after the investigation results were inconclusive, which was in mid-March. (Riedel Depo. 34). Woodell was notified by a letter dated May 18, 2001, that his IME was set for June 4, 2001. (Gilmore Depo. Exhibit 15). Ormet claims that the reason for the delay in setting Woodell's IME was due to a shortage of personnel, specifically a benefits clerk, in the Human Resources Department. (Gilmore Depo. 23). Woodell attended the IME on June 4, 2001. The doctor who performed the IME concluded that Woodell was able to return to work and informed Gilmore in a letter dated June 4, 2001, of that determination. (Gilmore Depo. Exhibit 1).
 {¶ 50} This determination was then forwarded to Unum Provident, their insurance carrier, which conducted its own review of the IME. (Gilmore Depo. Exhibit 2). Unum determined that Woodell was no longer entitled to the disability benefits in the policy and informed Woodell of this determination in a letter dated July 13, 2001. (Gilmore Depo. Exhibit 2). A copy of the letter was sent to Gilmore who then on July 17, 2001, ordered Woodell back to work. (Gilmore Depo. Exhibit 3). Woodell failed to report to work and by a letter dated July 24, 2001, Woodell was informed that Ormet had terminated his employment. (Gilmore Depo. Exhibit 4).
 {¶ 51} Woodell filed the original complaint on April 20, 2001. This was three to four months after the investigation began as to whether Woodell could return to work. Woodell does not dispute that the investigation as to whether he could return to work occurred at this time. Therefore, the decision to investigate Woodell to determine if he could return to work, which was the initiation for Ormet's ordering him back to work and later his termination for not returning to work when the medical report disclosed that he could, was not dependent on the lawsuit and his contacting an attorney. Rather, it was dependent upon an Ormet employee seeing him in the pizza shop allegedly working while he was collecting long term disabilities from Ormet. Furthermore, given the results of the IME and Unum's determination, which are not disputed by Woodell, the facts in this case do not support the determination that ordering Woodell back to work and subsequent termination for not returning to work was retaliatory for filing a lawsuit.
 {¶ 52} Woodell argues that one statement made by Boger lends support for his public policy tort. During the deposition, Boger was asked whether ordering Woodell back to work could be perceived as retaliation for his filing a lawsuit against Ormet. (Boger Depo. 50). She answered, "I'm sure I understood that it could be perceived that way." (Boger Depo. 51).
 {¶ 53} This argument is unpersuasive. First, as stated above, the initiation of ordering him back to work began months before the actual order was given. Secondly, Boger stated that she relied on the IME and Woodell's failure to report to work when scheduled in making the termination. (Boger Depo. 61, 62). Furthermore, others involved in the termination process testified that the decision was based upon Woodell's failure to show up for work when he was scheduled and the result on the IME which concluded that he could return to work. (Schweinsberg Depo. 63; Mallett Depo. 37-38) Mallett testified that while he was aware of the lawsuit, during the termination discussion with Riedel and Schweinsberg the lawsuit was not discussed. As such, considering all the above, the trial court's determination that Woodell could not establish a public policy tort was correct.
 B. Spoliation of Evidence {¶ 54} On April 23, 2003, Woodell filed a Motion for Sanction of Judgment against Ormet for spoliation of evidence. The trial court overruled the motion in a one sentence journal entry providing no reasoning. 06/27/02 J.E.
 {¶ 55} Spoliation of evidence was recognized in Ohio as an independent tort in Smith v. Howard Johnson Co., Inc., 67 Ohio St.3d 28, 1993-Ohio-229. In Smith, the court delineated the elements for evidence spoliation: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of the defendant that litigation exists or is probable, (3) willful destruction of evidence by the defendant designed to disrupt plaintiff's case, and (4) damages proximately caused by the defendant's acts. Id.
 {¶ 56} In regards to this claim, two types of evidence are at issue, the written strike log and security camera videotapes. Michael Blair, Ormet's Safety Services Manager, and Jack Skidmore, Blair's supervisor, directed the creation of a written record called the strike log to document certain activities near the shanties, which were located along Route 7 at the entrance of Ormet's plant, by the USWA members. Declaration of Michael Blair filed on 05/21/03. Blair and the supervisors instructed the guards to keep detailed accurate records. Declaration of Blair. A copy of the strike log that was filed with the trial court is an estimated 500 pages. Out of those pages, there is one reference to Woodell.
 {¶ 57} Woodell claims that there should be over 20 references to him in the strike log. He claims that since there are not, Ormet must have destroyed portions of the strike log that reference him.
 {¶ 58} In response to Woodell's claims, Ormet filed a Motion in Opposition to Sanction of Judgment. Filed along with that motion is an affidavit from Michael Blair. The affidavit states that after reviewing the original strike log, "it is apparent that, contrary to direction from their supervisors, the guards did a very poor, spotty job of creating the log beginning about October 31, 1999." Blair Declaration paragraph 6. The affidavit goes on to state:
 {¶ 59} "No portion of the `Strike Log' has been discarded or destroyed. There never was more than one volume and that volume simply never contained more entries than it does now." Blair Declaration paragraph 7.
 {¶ 60} Given this information, the third element of spoliation of evidence cannot be met, i.e. willful destruction of evidence. While Woodell contends that statements made during deposition indicate that his name should have appeared in the strike log numerous times, the testimony in those depositions does not indicate that his name was actually entered into the strike log that many times, but rather that maybe it should have been entered numerous times. When Baker was asked if he remembered a chant "Woodell come on out," he responded that he did. (Baker Depo. 63 — Baker was a security guard at Ormet)). However, when he was asked as to whether he entered that chant into the strike log, he responded that he was not sure. (Baker Depo 63). When asked if he wrote down Jeff's name in the strike log, he responded that he did, however, he could only recall that he would have written it down more than once. (Baker Depo. 10). When asked if other guards wrote down Woodell's name in the strike log, he responded that he did not know, but they probably should have. (Baker Depo. 64). He also stated that if something happened at a shift change then it should be in the strike log, but if it had occurred at any other time then it would be in an incident report. (Baker Depo. 150). Therefore, given this information, the trial court did not err when it overruled Woodell's motion for sanctions of judgment on the issue of the strike log.
 {¶ 61} In addition to a strike log, there was also video surveillance of fixed locations at the plant. There were five different designated locations taped, however, this video equipment did not tape sound. Ormet alleges that the videotapes for four of the five cameras were taped over to avoid the expense of having to purchase additional new videotapes and to reduce the burden of storing so many videotapes. However, the tapes of the main gate were not recorded over. Ormet states that no videotapes recorded during the May 31, 1999 to May 12, 2000 labor dispute were taped over after March 23, 2001 (when Ormet first received notice of possible litigation) and none were ever discarded. Ormet states the recording over of tapes was completed more than 10 months before Ormet had any notice that Woodell's claims were even probable, let alone pending.
 {¶ 62} The Blair affidavit also states that on August 25, 1999, he directed the tapes from two of the recorders to be preserved for only five days after which they should be taped over. Paragraph 12. A total of 20 tapes would be recycled continuously through those two recorders. Paragraph 12. Blair additionally stated the following:
 {¶ 63} "As the labor dispute dragged on, I believe the supply of blank videotapes ran out and the guards had to begin taping over videotapes from B and E recorders, as well as pre August 25, 1999 tapes from the A and D recorders, to create new C recorder tapes. The C recorder was considered to be of primary importance, since it monitored the main entrance to Ormet Primary's plant where one of the USWA shanties was located, where activities by USWA members were occurring in close proximity to Ohio Route 7 and where several vehicle accidents occurred during the labor dispute, one even involving a public school bus." Paragraph 15.
 {¶ 64} Furthermore, he stated that no videotapes recorded during the May 31, 1999 to May 12, 2000 labor dispute were taped over after March 23, 2001 [when Ormet was first put on notice of possible litigation] and none were ever discarded. Paragraph 19.
 {¶ 65} Given this information, Woodell's mere allegations that the videotapes were destroyed willfully after notice of the lawsuit is insufficient to sustain the allegation of spoliation of evidence. Furthermore, numerous people testified of the statements that Woodell claimed were made about him during this labor dispute, even high-level supervisors. Thus, the need for either the strike log or the videotape is not imperative to the claims raised to the trial court or to this court. The lack of the alleged entries in the strike log or lack of videotapes does not destroy Woodell's ability to assert his claim. Therefore, the trial court's decision was correct.
 {¶ 66} Alternatively, under this argument Woodell argues that even if Ormet's conduct was merely negligent or inadvertent, the nature and importance of the evidence entitled him to Sanction of Judgment. Woodell's argument is unpersuasive.
 {¶ 67} Under a spoliation of evidence claim, the party making the allegation must allege "willful destruction of evidence." Ohio does not recognize a cause of action for negligent spoliation of evidence. Whitev. Ford Motor Co. (2001), 142 Ohio App.3d 384, 388. "Willful" reflects an intention and wrongful commission of the act which contemplates more than mere negligence. Id. Accordingly, any assertion that Ormet negligently destroyed evidence fails.
 C. Other Trial Court Rulings {¶ 68} In addition to appealing the trial court's grant of summary judgment and denial of spoliation of evidence cause of action, Woodell also finds fault with two other trial court rulings: the trial court's denial of Woodell's motion to amend the complaint, and the trial court's decision to assess costs against him. (Assessment of costs as to the Union decision was already addressed in Woodell, 156 Ohio App.3d 602,2004-Ohio-1558, at ¶ 39-44.) Each will be addressed separately.
 1. Denial of the Motion to Amend the Complaint {¶ 69} Woodell filed a motion to file a Fifth Amended Complaint on March 31, 2003. The trial court denied the request in a journal entry on April 2, 2003. The fifth amended complaint would have added a new cause of action against Ormet sounding in negligence. Woodell claims that after extensive discovery it was revealed that Ormet had the availability of a movable security camera to deter and prevent the abuse of Woodell, but failed to use this technology to their advantage.
 {¶ 70} Civ.R. 15(A) governs amendments to pleadings, which provides in pertinent part:
 {¶ 71} "[A] party may amend his pleading only by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice so requires."
 {¶ 72} Whether to grant a motion for leave to amend a pleading is within the discretion of the trial court. Turner v. Central Local SchoolDist., 85 Ohio St.3d 95, 99, 1999-Ohio-207. Abuse of discretion connotes more than an error in law or judgment; it implies that the trial court's attitude is arbitrary, unreasonable, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. While Civ.R. 15 provides for liberal amendments, the court should refuse such motions if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. Turner, 85 Ohio St.3d at 99; Hoover v. Sumlin (1984),12 Ohio St.3d 1, paragraph two of the syllabus. The primary consideration is whether there is actual prejudice to the opposing party because of the delay. Schweizer v. Riverside Methodist Hospitals (1996),108 Ohio App.3d 539, 546.
 {¶ 73} In the case at hand, the motion for leave to file a fifth amended complaint occurred one day before the expiration of the discovery. Dispositive motions were due in approximately 30 days and the trial was set for mid-July (a couple of months away). The case had been proceeding for two years prior to this request. At no time during those two years was it ever asserted that Ormet was negligent in any way. The claims made in the complaint were based upon intentional, not negligent conduct. As such, it appears that the trial court did not abuse its discretion in denying the motion as Ormet would have been prejudiced by granting the motion.
 {¶ 74} Further, in support of the trial court's denial of the motion, Ormet asserts that there was no good reason why Woodell could not have made his proposed negligence claim from the outset of the case. Ormet contends that the negligence claim is premised upon Woodell's request for video surveillance of his work area in which Ormet responded that there was no video surveillance of that area. The request for this video surveillance occurred before May 2000, according to Ormet. Therefore, according to Ormet, this claim could have been made long before April of 2003.
 {¶ 75} While it is true that Woodell did not discover that Ormet had movable cameras until the Hickman deposition on February 6, 2003, approximately two months prior to the motion to amend the complaint, this fact does not change the length of time the case was pending, the considerable amount of discovery that had already occurred and that discovery would only last one more day. Even though amendments should be freely allowed in the interest of justice, given the facts in the case at hand, we cannot conclude that the trial court abused its discretion. Accordingly, this argument lacks merit.
 2. Assessment of Costs Against Woodell {¶ 76} Civ.R. 54(D) states:
 {¶ 77} "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."
 {¶ 78} This court will not reverse a lower court's assessment of costs absent an abuse of discretion. Keaton v. Pike CommunityHosp. (1997), 124 Ohio App.3d 153, 156.
 {¶ 79} Woodell argues that it was within his rights to bring this cause of action against Ormet and the Union. He contends that the action was not a frivolous suit meant to harass appellees or to waste their time and resources. He also states that the trial court acknowledged that he had "endured horrific verbal abuse and insulting graffiti aimed not only at himself but his wife and family." He contends that given the nature of this case and the extent of discovery, it was arbitrary, unreasonable and unconscionable for him to "bear the full brunt of the court costs associated with prosecuting this action."
 {¶ 80} Ormet argues that it has no record of costs to recover and it has not sought any award of non-record costs. It claims the trial court's own costs are less than $400 and, therefore, is no reason why the public should bear these costs. It contends that the trial court's assessment of costs was not an abuse of discretion.
 {¶ 81} The trial court correctly stated that Woodell endured horrific verbal abuse and, furthermore, he was entitled to bring his cause of action. As such, we find that the trial court did abuse its discretion. We are cognizant of the fact that in Woodell, 156 Ohio App.3d 602,2004-Ohio-1558, at ¶ 39-44, we stated that we found no abuse of discretion in the trial court's order that Woodell and not the union was to pay court costs. However, we view the assessment of costs against Woodell as to Ormet in a different light. To require Woodell to sustain the burden of court costs in this type of action might deter a person put in the same position from bringing a valid employer intentional tort/wrongful discharge claim. The type of actions taken by Ormet employees against Woodell were, as the trial court stated, "horrific." Thus, it is these types of actions which are appropriately raised in an employer intentional tort case (even though this case did not survive summary judgment). As such, Woodell should not sustain the full brunt of the court costs. Woodell's argument in this respect has merit.
 CONCLUSION {¶ 82} For the foregoing reasons, the judgment of the trial court is hereby affirmed in part and reversed in part. The trial court's grant of summary judgment for Ormet on Woodell's employer intentional tort claim and wrongful discharge claim is affirmed. Additionally, the trial court's denial of sanctions on the motion for spoliation of evidence is also affirmed. Furthermore, the trial court did not abuse its discretion in denying Woodell's motion to amend the complaint. However, as to the issue of assessment of costs, the matter is reversed. Costs are assessed against Ormet.
Donofrio, P.J., concurs.
Waite, J., concurs.